PHIPPIN v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

Division Two, May 22, 1906.

1. NEGLIGENCE: Conflict in Evidence: Province of Court. Where the evidence as to whether the act which led to the injury was negligently performed is conflicting, even that of defendant not being in harmony, it is the province of the jury to settle the issue; and if there is substantial evidence to sustain the verdict, as there was in this case, it is no part of the province of the court to say that the testimony was so overwhelmingly against plaintiff as to be entitled to no consideration.

2. ———: Cornering Cars: Act of Fellow-Servant. The rails of two tracks approached close to each other, so that cars run back on one of them would collide with a stationary car on the other, and the charge was that while plaintiff, a switchman, was at his post at the stationary car, prepared to effect a coupling, the switchtender, contrary to his duty, turned the moving cars onto the wrong track, and they cornered with the stationary car and mashed plaintiff's hand. The foreman and yardmaster testified that it was the duty of the switchtender to so line the switches that the cars would not corner, and there was substantial evidence that the switchtender from his position could have seen that the moving cars would collide with the stationary car if run on the other track, that he turned

196 Sup.—21

them on to that track, that the night was dark and plaintiff could not see, and was in the exercise of ordinary care. *Held*, that the switchtender was negligent, and being a fellow-servant of plaintiff, the defendant was liable under section 2873, Revised Statutes 1899.

3. ————: **Testimony in Conflict With Physical Facts.** It is the law of this State that where the established physical facts and common observation and experience conflict with the testimony of a witness, his testimony must yield and cannot be accepted as the basis of a verdict or judgment. But whether a given case falls within this rule must be determined by its facts. .

4. ————: ————: **Cornering Cars: Switchman: Contributory Negligence: Seeing Danger.** Where a switchman was at his post at stationary cars, attending to the duties devolved upon him to make a coupling with an approaching car, it is a question for the jury to determine whether or not, under the circumstances, he was guilty of contributory negligence in not seeing that the approaching car was on the wrong track and, would, because of the close proximity of the tracks, corner with the stationary car, and injure him, the car having been negligently placed upon the wrong track by the switchtender.

5. ————: **Cornering Cars: Assumption of. Risk.** The servant never assumes the risk of the master's negligence. A switchman, whose duty it was to make couplings of cars in a track yard, did not assume the risk of injury from cars cornering with each other, where the cars were made to so corner by the switchtender who negligently turned some of them on to the wrong track, for the negligence of the switchtender was the negligence of the company.

6. ————: ————: **Instruction: Assumed Negligence.** Plaintiff's instruction told the jury that "if they believe and find from the evidence that plaintiff was attempting to couple a certain stationary freight car, to a certain moving car backwards toward the same for the defendant railroad company, and his right hand and wrist were caught between the corners of said cars and injured, and that the said injury was caused by the negligence and carelessness of the switchtender, in throwing the switch for track No. 17 instead of track No. 18, thus causing the corners of the cars to collide and come together with force and violence, and that plaintiff was at the time in the exercise of ordinary care, then your verdict must be for plaintiff." *Held*, that this instruction did not assume that throwing the switch for track No. 17 was a negligent and careless act, but plainly required the jury to find that the injury was caused by the negligence and carelessness of the switchtender.

7 ———: **Excessive Verdict:** $12,000. Plaintiff was an exper-
ienced brakeman, forty-four years old, and had been receiving
$90 per month. His right hand was crushed, so that it had to
be cut away, leaving nothing but the thumb, which is stiff and
a useless deformity. He underwent intense pain for six months,
and at the time of the trial the stump was raw and unhealed.
*Held,* at the hearing, that a verdict for $12,000 was not exces-
sive, but on rehearing the amount is reduced to $9,000 and
interest from date of verdict.

8. **REHEARING: New Question: Appellate Practice.** An appel-
lant cannot inject into the case on motion for rehearing a prop-
osition which was not insisted upon either in the trial court
or in the appellate court until after a final judgment and opin-
ion.

Appeal from Jackson Circuit Court.—*Hon. J. H.
Slover,* Judge.

AFFIRMED ON CONDITION.

*Elijah Robinson* for appellant.

(1) The trial court should have directed a verdict
for defendant. 1. There was no evidence tending to
show negligence on the part of defendant. The mere
fact that an accident occurred does not raise a pre-
sumption of negligence on the part of the defendant.
It was necessary that plaintiff establish, by substantial
evidence, his allegation of negligence on the part of de-
fendant, which he failed to do. Blumenthal v. Torini,
40 Mo. 159; Rea v. Ferguson, 72 Mo. 225; Crane v.
Timberlake, 81 Mo. 481; Avery v. Fitzgerald, 94 Mo.
207; Long v. Moon, 107 Mo. 334; McFarland v. Accident
Assn., 124 Mo. 204; State v. Bryant, 134 Mo. 246; He-
witt v. Steele, 136 Mo. 327; Cole v. Armour, 154 Mo.
333; Ashley v. Green, 38 Mo. App. 292; Kehoe v. Phil-
lipi, 42 Mo. App. 292; Heintz v. Mertz, 58 Mo. App. 405;
Moore v. Railroad, 28 Mo. App. 622; Peck v. Railroad,
31 Mo. App. 123; Peffer v. Railroad, 98 Mo. App. 291;
Shertle v. Railroad, 97 Pa. St. 450. 2. The accident
was caused by the cars cornering, which was a common
occurrence. The danger of a switchman getting his

hands injured is an ordinary risk of his employment, and by undertaking the work he assumes all its ordinary risks. Steffen v. Mayer, 96 Mo. 420; Jackson v. Railroad, 104 Mo. 448; Schaub v. Railroad, 106 Mo. 74; Alcorn v. Railroad, 108 Mo. 81; Henry v. Railroad, 109 Mo. 488; Francis v. Railroad, 110 Mo. 387; Ring v. Railroad, 112 Mo. 220; Halloran v. Union Iron Co., 133 Mo. 470; Williams v. Railroad, 119 Mo. 316. 3. Plaintiff was himself guilty of negligence which directly contributed to the accident. If he had exercised reasonable and ordinary care the accident would not have occurred. Dolphin v. Railroad, 29 Am. & Eng. R. R. Cases (N. S.) 341; Aerkfest v. Humphrey, 145 U. S. 418; Kitzberger v. Railroad, 30 Am. & Eng. R. R. Cases (N. S.) 275. The physical facts show beyond question that he could have discovered that the approaching car was on track 17 in time to avoid the accident, and his statement to the contrary stands for nothing. Hayden v. Railroad, 124 Mo. 566; Kelsey v. Railroad, 129 Mo. 362; Nugent v. Milling Co., 131 Mo. 258; Lane v. Railroad, 132 Mo. 4; Huggart v. Railroad, 134 Mo. 680; Payne v. Railroad, 136 Mo. 583; Oglesby v. Railroad, 150 Mo. 188; Hook v. Railroad, 162 Mo. 598; Petty v. Railroad, 179 Mo. 687; O'Keef v. Railroad, 81 Mo. App. 386; Covell v. Railroad, 82 Mo. App. 180. Where a verdict is against every reasonable probability that might result from the evidence in the case, the inevitable conclusion must be that it was the result of partiality or prejudice on the part of the jurors, and a judgment based on such a verdict must be reversed. Jeans v. Morrison, 99 Mo. App. 208; Gage v. Trawick, 94 Mo. App. 307; Cook v. Railroad, 94 Mo. App. 417; Baker v. Stonebraker, 36 Mo. 345; Price v. Evans, 49 Mo. 396; Bautrain v. Railroad, 78 Mo. 44; Rosecrans v. Railroad, 83 Mo. 678; Spohn v. Railroad, 87 Mo. 74; Cannon v. Moore, 17 Mo. App. 92. (2) The court committed error in giving plaintiff's instruction 1. Said instruction assumed that

it was negligence on the part of defendant's switch-tender to put the car in question on track 17, instead of track 18. Peck v. Ritchey, 66 Mo. 121; Comer v. Taylor, 82 Mo. 341; Strong v. Hunt, 94 Mo. 475; Sweeney v. Railroad, 150 Mo. 385; Plummer v. Milan, 70 Mo. App. 598; Linn v. Bridge Co., 78 Mo. App. 111; Orscheln v. Scott, 79 Mo. App. 541. (3) The amount of the verdict was so grossly excessive that it raises a presumption of prejudice, passion or partiality on the part of the jury. Burdick v. Railroad, 123 Mo. 236; Hollenbeck v. Railroad, 141 Mo. 113; Whalen v. Railroad, 60 Mo. 323; Adams v. Railroad, 100 Mo. 555; Nichols v. Glass Co., 126 Mo. 55; Furnish v. Railroad, 102 Mo. 438; Chitty v. Railroad, 166 Mo. 435.

*Walsh & Morrison* for respondent.

(1) Gibbony, the switchtender, was unquestionably negligent in throwing the switch for track 17 instead of track 18. R. S. 1899, sec. 2873; Black v. Railroad, 172 Mo. 177; Cambron v. Railroad, 165 Mo. 543; Callahan v. Railroad, 170 Mo. 496. (2) Plaintiff was not guilty of contributory negligence. Cambron v. Railroad, 165 Mo. 560; Hollenbeck v. Railroad, 141 Mo. 110; Young v. Oil Co., 185 Mo. 668; Barry v. Railroad, 98 Mo. 70; Hamilton v. Mining Co., 108 Mo. 364. This court will not undertake to settle contradictory statements of witnesses and usurp the province of the triers of fact. Wright v. Kansas City, 88 S. W. 456. (3) The question of assumption of risk has no place in this case. Gibbony's negligence was the negligence of the defendant, and an employee never assumes the risk of the master's negligence. Curtis v. McNair, 173 Mo. 280; Wendler v. People's House Furn. Co., 165 Mo. 527; Warren v. Railroad, 87 S. W. 585; Blanton v. Dold, 109 Mo. 64; Settle v. Railroad, 127 Mo. 336; Pauck v. St. L. D. B. Co., 159 Mo. 467. (4) Plaintiff's instruction 1 does not assume that the switchtender

was negligent, but submits that question to the jury as a question of fact. Geary v. Railroad, 138 Mo. 251; Damman v. St. Louis, 152 Mo. 186; State v. Grayor, 89 Mo. 605; O'Connell v. Railroad, 106 Mo. 482; Railroad v. Gore, 202 Ill. 195; Railroad v. Smith, 22 Neb. 782; Railroad v. Lehmberg, 75 Tex. 66. But under the evidence in this case on behalf of both plaintiff and defendant, the trial court would have been justified in declaring as a matter of law that Gibbony was negligent, and such an instruction would not have constituted error. Fullerton v. Fordyce, 144 Mo. 529, 121 Mo. 1; Schmidt v. Railroad, 163 Mo. 658; Barry v. Railroad, 98 Mo. 62. (5) The verdict is not excessive. Dougherty v. Railroad, 97 Mo. 647; Chitty v. Railroad, 166 Mo. 443; Waldheir v. Railroad, 89 Mo. 37; Markey v. Railroad, 185 Mo. 348; DeWardener v. Railroad, 1 App. Div. 240; Erickson v. Railroad, 11 N. Y. Misc. 662; Railroad v. Spurvey, 97 Ill. App. 570; Tulley v. New York & T. S. Co., 10 App. Div. 463; Railroad v. Scott, 21 Tex. Civ. App. 24.

GANTT, J.—On the 22nd day of March, 1902, the plaintiff commenced this action for damages in the circuit court of Jackson county, Missouri.

After alleging that the defendant was a railroad corporation duly organized under the laws of this State, his petition proceeds to aver: "That on the 15th day of September, 1901, and for several months prior thereto, plaintiff was, and had been, in the defendant's employ as a switchman in its railroad yards situated in what is known as the west bottoms of Kansas City, Jackson county, Missouri; that plaintiff's duties were to couple and uncouple cars, switch them about and make them up into trains, and to obey orders and directions of his yard-master and foreman, who were superior in grade and authority to plaintiff; that it became and was the duty of the defendant at such time and place, to use ordinary care to provide plaintiff a reason-

ably safe place in which to work, to use ordinary care to avoid injuring plaintiff while performing his duties, and that it was also defendant's duty, acting through plaintiff's superiors as aforesaid, to take proper precaution to prevent injury to plaintiff; that at or about the hour of 8:30 o'clock p. m., of the 15th of September, 1901, and in the darkness of the night, plaintiff was working with a switch crew, whose foreman was one G. W. Zibble, and said crew was operating defendant's engine No. 310, which was in charge of one F. F. Wood, an engineer; that said defendant at such time and place provided a switchtender, one Edward Gibbony, whose duty it was, under the supervision of said yard-master and foreman, to throw the switches in said yards and see that the same were properly set; that at said time and place there were certain stationary cars standing on what is and was known as track No. 18, which was and is located at a point in said yards where Liberty street and Union avenue, both public streets of Kansas City, would intersect, if prolonged; and that said stationary cars stood about forty or forty-five feet west of the point at which was located a certain ground switch and at the point of said switch both said track No. 18, and also a certain track known as track No. 17, ran into a certain main track; that at said time and place it became and was the duty of plaintiff to couple said stationary cars on to certain other cars at the time being moved backwards attached to the switch engine aforesaid, and plaintiff was standing with his right hand upon the rod of the first of said stationary cars in readiness to make the coupling at the place and in the manner required by his duty, and under the custom and rules of the defendant; that the point at which stationary cars were standing was in close proximity to said track No. 17, so that cars running upon said track No. 17, in a westerly direction,

would necessarily come in contact with the corner of the car at which plaintiff was standing; that when said cars were backed from said main track on to track No. 17, instead of track No. 18, and on account of being backed upon said track No. 17 instead of said track No. 18, the coupling did not meet, but the corners of the cars at which plaintiff was so standing, engrossed in his work as aforesaid, were brought into violent contact with each other and his body was thus caught between said cars, and his right hand, arm and wrist caught between the corners of said cars and mashed and crushed so that his entire hand, save and except a fragment of the thumb, had necessarily to be amputated; that said injury was occasioned to plaintiff by the negligence, carelessness and want of ordinary care on the part of the defendant, its agents, servants and employees in the following respects, to-wit:  That said defendant by and through its agent, servant and employee, said Gibbony, negligently, carelessly and unskillfully threw said switch, permitting the moving cars to run in upon track No. 17 instead of track No. 18.''  Other charges of negligence are contained in the petition but all of them except the foregoing were disregarded on the trial of the case and the case was submitted to the jury solely on the question of the negligence of the switchtender, Gibbony, in throwing the switch for track No. 17 instead of track No. 18.   The petition further alleged that the said injury to plaintiff has caused him the most intense pain and suffering, both mental and physical, ever since its occurrence, and will for sometime in the future continue to do so; that at the time of his injury plaintiff was a strong, able-bodied man and was able to earn, as a railroad switchman, ninety dollars per month, but that his earning capacity by said injury has been entirely destroyed; that plaintiff has been permanently deformed and rendered a cripple thereby, and has been deprived of all ability to earn his own livelihood, all to his great damage in the sum of

fifteen thousand dollars, for which he prays judgment and costs.

The answer admitted the incorporation of the defendant, and that on or about September 15, 1901, an accident occurred wherein plaintiff was injured, but denied that he received injuries of the character and to the extent in said petition set forth, and denied that plaintiff's injuries were caused by any negligence or carelessness on the part of the defendant, its servants, agents and employees, and denied each and every other allegation in said petition not expressly admitted to be true.    There was also a plea of contributory negligence.    Plaintiff filed a reply, which was a general denial of all new matter alleged in the answer.

The cause was tried on the 23rd of June, 1902, and resulted in a verdict for the plaintiff for twelve thousand dollars and costs.   In due time the defendant filed its motion for new trial and in arrest of judgment which were heard and overruled, and the defendant excepted and thereupon appealed to this court.

On the part of the plaintiff the evidence tended to prove that the plaintiff was a night switchman of the defendant in its yards at Kansas City, at the time he received the injury complained of.   The night yard-master was Joseph Maroney, and the crew of which plaintiff was a member consisted of Emmet Green, the foreman, George Zibble and C. Mills, switchmen, Wood, engineer, Burnett, fireman, and a switchtender named Gibbony, and the plaintiff.   At the time of the accident, Green had gone to lodge, and Zibble had been appointed foreman in his place by Maroney the yard-master, Mills was over at the Union Pacific yards some distance away, Wood and Burnett were on the engine, and so far as the record shows, knew nothing of the facts causing plaintiff's injury.   Gibbony was dead at the time of the trial.

The plaintiff testified that the point at which the accident occurred was about 45 feet from the ground

switch connecting the two tracks, No. 17 and 18.  Plaintiff testified that the photograph marked "Exhibit A," attached to plaintiff's additional abstract of the record, correctly represented the directions and the yard at the place where he was injured; that the photograph marked "Exhibit B" represents the same place looking in an opposite direction towards Hickory street and

LIBERTY ST

UNION

SWITCH STAND AVE

SWITCH STAND

SWITCH STAND

GROUND STAND

SWITCH STAND

POINT OF ACCIDENT

FROG

Scale 1"=20'
Book 201, Pg 61

PROPERTY OF FRANK WALSH

Union avenue; that "Exhibit C" correctly represents the tracks 17 and 18 and the ground switch and point of accident.   These exhibits and photographs will accompany this opinion.   He further testified that the crew were switching a long line of cars; one or two cars had been placed on track 18 so that the east end of the one towards the east, which was a coal car, was about 40 to 45 feet from the ground switch, at which point the north rail of track 17 was about a foot and a half or two feet from the north rail of track 18 and the south rails of the respective tracks were thus the same distance apart.   The second cut went down on track No. 8 and plaintiff rode it down and coupled the cars on to a car on that track; then he ran back towards track No. 18 to couple the next cut on to the cars standing on track 18.   Plaintiff had been with Zibble when he marked the cars with chalk and knew that this cut which was then being shoved in, was marked for track 18.   When the plaintiff reached the stationary car on track 18, he took hold of the lever with his right hand and held it ready to drop it when the automatic couplings came together.   He was then standing facing north with his right hand about a foot or eighteen inches in from the side of the car.   He had his lighted lantern in his left hand and there was nothing to obstruct Gibbony's view of him.   When plaintiff arrived at this point he glanced at the approaching cars, which were then about six feet away from him and then looked towards the coupling that he was trying to make. He supposed that the cars were on track 18 as marked with the chalk, but Gibbony had thrown the switch and they were on the lead of track 17.   The cars came together and by reason of being in different leads the approaching car was about two feet to one side, so that the drawheads slipped past each other and each went underneath the other car, and the ends of the cars came together, and plaintiff's hand was caught by a big bolt on the end of the truss rod which comes through the

end of the car, and was mashed against the opposite car. One of the cars was thrown off of the track by the force of the collision and the cars were shoved some sixty to seventy feet to the point of the frog before they were stopped. At the time of the accident, Gibbony was opposite the ground switch forty or forty-five feet away from the plaintiff. It was Gibbony's duty to see that the switch was thrown. It was also the duty of Gibbony and Zibble to see that the cars did not corner. The switchman making a coupling has to hold the lever and cannot watch other things, but it is the duty of the switchtender and foreman to watch out. There was no electric light near there. Zibble was about fifteen feet east of Gibbony when the collision occurred and Maroney was farther away, up near Hickory street. The accident occurred about 9:30 o'clock p. m. Plaintiff was taken to the hospital, where he remained from the time of the accident, September 15, 1901, until the following March, 1902. An attempt was made to save the thumb of the hand, but the leader was so badly mashed and bruised that the skin died, and at the time of the trial all that remained of the hand was the stiff and useless thumb. Plaintiff testified that he suffered great pain and the hand never healed and pained him at all times. He was forty-four years of age and earned ninety dollars per month at the time he was injured. This was in substance the plaintiff's evidence in chief.

On the part of the defendant, Joseph A. Maroney, the night yard-master, testified he did not see Phippin from where he was at the time of the accident. He was about thirty yards east of Zibble at the time of the injury to plaintiff. By holding up a lamp, a man can see along the rail to distinguish the rail for about ten feet. There was a stationary car on track 18, and the next car was marked for track 17. The car that struck Phippin had to stand

awhile after it was kicked on to track 17, but was shoved down, a string coupled on and started it moving again. A man standing at the switchstand could see well enough to tell whether a car that was shoved on 18 had been cleared so as to let another pass on 17. On cross-examination Mr. Maroney said that a man in plaintiff's position coupling a car which was coming from the east looks right north at the coupling that is being made, and that this is the usual and customary way of doing it, and though they call them automatic couplings, they will not all couple automatically, and to insure a coupling, the switchman takes the lever and holds it up and the crank is there for the switchman to catch hold of. There was no light on this ground switch where Gibbony was, and he had told Zibble to act as foreman in place of Green, the regular foreman. It was the duty of the switchtender to line the switches, to see that the cars did not corner, and if they do it is a violation of the rules.

G. W. Zibble testified that at the time of the plaintiff's injury he was forty or fifty feet east of the ground switch. The car that struck Mr. Phippin was marked for track 17. Cars corner sometimes, but it can be prevented, provided the switchtender does not throw the switch for some opposite track. These two cars cornered, because the switchtender threw the switch for the wrong track. It was Gibbony's duty to see that the cars did not corner, and the switchman had to depend on that and did depend on it. He gave the signal to back up, and saw Phippin go in to make the coupling. Gibbony threw the switch. The witness intended that these cars should back up to the car standing on the track 18 so that it would be coupled on, and he saw Phippin ready to couple on to the stationary car. There was no stationary car standing on track 17, it was clear when he gave the signal, and the switchtender instead of throwing the switch for 18, the track the car was on, threw it for track 17, which was empty.

Phippin was standing there holding his hand where he had to hold it, and the cars cornered and held him; the cars on 18 went a good ways and one of the cars that cornered was derailed. Gibbony was standing there and he could see that the car did not clear. This in substance was the evidence by the eye-witnesses to the accident.

Mr. C. E. Carson was called by defendant as an expert witness, and testified that he was a superintendent of terminals for the Missouri Pacific Railroad, and that he had measured the distance between the rails at a point forty-five feet west of the ground switch, and his recollection was that the distance was two feet five and a half inches, but that he did not charge his memory with it. Six feet farther east the distance was seven inches less. He testified that he had made a test, and that at this point the bodies of two cars would not come together, because of the draft of the drawheads, which would make a space of a foot or so between the bodies of the cars. The cars would have to be one hundred and twenty five feet from the switch point for the cars to come together. He was not there when Mr. Phippin was hurt and did not know how it happened. Was merely testifying as an expert. He stated that cars frequently cornered, and thought that the switchman could distinguish for fifteen to eighteen feet whether a car was on track 17 or 18, and there was nothing to prevent a switchman from looking at an approaching car when making a coupling.

Mr. Francis Shade, a stenographer, testified with regard to the correctness of a transcript of the plaintiff's deposition, and Mr. Morrison testified on the same subject in rebuttal. The defendant then read in evidence the following portion of the deposition taken by the defendant before the trial which was as follows: "Q. Could you see the track that you were standing next to? A. No, sir; I could not see the track until I came over on it. Q. When you were on the track how

far along could you see? A. About from here to that door? Q. How many feet? A. Eight or ten or fifteen. Q. How far could you have seen the rail of the track if you had been looking down the track and close to it? A. I could have seen about four feet, because my light was back here. Q. You mean that you could only see the rails four feet from you? A. Yes, sir; only four feet. The shadow of my lamp was back of me."

The foregoing was practically all the evidence in the case.

At the conclusion of the evidence the court gave the following instruction for the plaintiff:

"1. The jury are instructed that if they believe and find from the evidence, that on September 15, 1901, the plaintiff, George L. Phippin, was attempting to couple a certain stationary freight car, to a certain moving car backing towards the same, for the defendant railroad company, and that his right hand and wrist were caught between the corners of said cars and injured, and that the said injury was caused by the negligence and carelessness of the switchtender in throwing the switch for track No. 17, instead of track No. 18, thus causing the corners of the cars at which plaintiff, Phippin, was standing, to collide and come together with force and violence, and that the plaintiff, at the time, was in the exercise of ordinary care himself, then your verdict must be for the plaintiff."

And the following instructions for the defendant:

"2. The court instructs the jury that when plaintiff entered the employ of the defendant he assumed all the ordinary risks of the employment and it was his duty to exercise reasonable care and diligence in protecting himself from injuries; and if the jury believe from the evidence in the case that plaintiff was an experienced railroad switchman, and could by the exercise of such reasonable care and diligence have ascertained, in time to avoid the accident, that the car

that was approaching him from the east was on track No. 17 and the stationary car was on track No. 18, so that the corners of the two cars would come together, then he is not entitled to recover, and it is your duty as jurors to find a verdict for the defendant. By reasonable care and diligence is meant such care and diligence as an ordinarily prudent and careful man would usually exercise under the same or similar circumstances.

"3. The court instructs the jury that if you believe from the evidence in the case that the number of men employed in switching at the time that the accident occurred were sufficient to handle the cars with safety, by the exerise of reasonable care, then the plaintiff is not entitled to recover on account of any insufficiency in the number of men employed in that work.

"4. The court instructs the jury that the plaintiff, Phippin, has been a witness in his own behalf in this case, and the jury are the sole judges of his credibility. All statements made by him, if any, which are against his own interest, must be taken as true, but his statements in his own favor are only to be given such credit as the jury, under all the facts and circumstances in evidence, deem them entitled to.

"5. The court instructs the jury that if the physical facts as shown by the evidence in this case are in conflict with the statements of any witness who has testified in this case, then it is your duty to take into consideration what is shown by the physical facts and to disregard the statements of witnesses in conflict with such physical facts, if any.

"6. The court instructs the jury that in passing on this case you should take into consideration the facts and circumstances developed by the evidence in the case, and, in arriving at a verdict, you should be governed alone by the evidence and the instructions of the court, which are given for your guidance, and should not suffer yourselves to be in any way influenced by

the fact that the plaintiff is an individual and the defendant a railroad company."

And refused the following instruction numbered one asked by the defendant: "1. The court instructs the jury that under the pleadings and the evidence in this case the plaintiff is not entitled to recover and your verdict will, therefore, be for the defendant."

I.   The first contention of the defendant in this case for a reversal of the judgment is that there was no substantial evidence tending to show negligence on the part of the defendant, and, therefore, the court should have directed a verdict for the defendant. This insistence is predicated largely upon the claim that there was no substantial evidence in the case tending to show that the car which was thrown on track No. 17 and which cornered and collided with the stationary car on track No. 18 and thereby caused the injury to the plaintiff, was negligently put upon the track No. 17, instead of on track 18. This claim necessarily requires a consideration of the testimony on this point. The testimony of the plaintiff and of Zibble who was the acting foreman of plaintiff's crew that night when switching and making up trains, was to the effect that just prior to the injury to plaintiff, one or more cars were standing stationary on track No. 18 about forty or forty-five feet from the ground switch, and that it was the duty of Gibbony as switchtender of that switch to line the switches, and to see that cars did not corner, and that there were no cars on track 17. The engine and the moving cars were coming from the east. The plaintiff testified that the box car which cornered with the car at which he was standing prepared to couple it to the car coming from the east, was marked in chalk 18, and that this mark indicated that it should go on track No. 18. Plaintiff testified that he saw Zibble, the foreman, when he marked the cars with chalk, and knew that this cut of cars which was then

being shoved in was marked for track 18. Just prior to this he had gone down to track No. 8 with the second cut, and having coupled the cars on that track, had run back to track 18 to couple the next cut on the cars standing on track 18. Zibble and Maroney, witnesses for the defendant, testified that the car in question was marked for track 17 instead of for track 18, and it is insisted by the defendant that the testimony was so overwhelmingly against the plaintiff in regard to the numbering of these cars that plaintiff's evidence on this point is not entitled to any consideration. Plaintiff testified that before the accident that night, he had been along a string of cars that were to be switched, looking at the numbers on the cars to see where they went, and seeing to the brakes on them, and if there were any couplings to make; that he was following Zibble, the foreman who was marking the cars. Mr. Zibble was asked who put those figures on the car, and he replied that he did; he was asked where plaintiff was at the time he marked the cars and he answered he was along with him down on the track, and when asked whether plaintiff saw him put the figures on the car, he answered, "He was walking along there, I do not know whether he paid any attention to the figures or numbers I was putting on the car or not, I cannot say about that." On the other hand, Maroney testified that he had marked those cars and that he put the figure 17 on this car. Thus there was a conflict between the defendant's two witnesses Zibble and Maroney as to who put the marks on the car in question. But we think it is too clear for discussion that in this state of the evidence it was a question for the jury to determine whether this car was marked for track 17 or track 18, and it is not the province of this court to settle that question. That plaintiff understood that the car was coming back on track 18, there would seem to be little ground for controversy. When he came back from track 8 he went to the stationary car on track 18,

which stood about forty-five feet from the ground switch at which Gibbony was stationed, and took hold of the lever, which was a foot or eighteen inches from the side of the car, with his right hand and pulled the lever down off of the catch and held it preparatory to making a coupling with the car or train which was being backed up from the east. This conduct on his part would have been entirely useless had he expected the car from the east to lead down on track 17, as it would have been perfectly apparent that he could not couple his car to the car coming from the east on 17, and there were no stationary cars on track 17. Both Maroney and Zibble, witnesses for the defendant, the one the night yard-master, and the other the foreman of this crew with which plaintiff was working, testified that it was Gibbony's duty as switchtender of that ground switch to line switches and to see that the cars did not corner, that is, to see that all cars were in the clear. Now, while defendant insists that it was not the intention that this car should be pushed west on track 18 and coupled with the stationary car standing near the ground switch, Mr. Maroney testified in regard to Gibbony's opportunity to see that these cars would corner if the box car was switched on track 17, as follows: "Q. Could a man see well enough to tell whether a car that was shoved on track 18 had been cleared so as to let the others pass by on 17, I mean from the switch stand? A. Yes, sir." Mr. Zibble testified as follows: "Q. Do you mean to say that you gave the signal for the engineer to move the car onto 18? A. I gave him the signal to back up, supposing that he was going on 18. Q. You supposed he was going on track 18? A. Yes, sir; that was the information that I got from Mr. Maroney when he went by me. Q. Did Mr. Gibbony have any such information? A. He was standing right there, and could see that the car did not clear. Q. Did he have any information except what was shown on the tab? A. That was sufficient."

On recross-examination on this same subject Zibble testified further: "Q. He could see it? A. Yes, sir, he could surely see it." Zibble and the plaintiff were the only actual eye-witnesses to the accident. Zibble testified that he gave the signal to back up; that it was very dark there, but he saw Phippin, the plaintiff, go in to make the coupling. Gibbony threw the switch; that he, Zibble, intended that these cars should be backed up to this car standing on 18 so that they would be coupled together. Zibble at the time he gave the signal was standing close to Gibbony, and saw Phippin, the plaintiff, ready to couple on the stationary car; that there was no stationary car standing on 17. He testified that the switchtender, Gibbony, instead of throwing the switch for 18, the track the car was actually on, threw it for 17. He testified that the reason these two cars cornered was that "the switchtender threw the switch for the wrong track, that was all." Thus there was evidence independent of the numbers on the car which tended to show that it was the duty of Gibbony to see the cars did not corner, and that from his position at the ground switch Gibbony could see that the cars did not clear, and that if he sent the backing cars on to track 17 it would corner with the stationary car standing only forty-five feet distant on track 18, and seeing the plaintiff standing there with his lantern, it was negligence on the part of Gibbony to throw the switch for track 17 instead of track 18. In view of this evidence, we cannot agree to the proposition of the learned counsel for the defendant that there was no substantial evidence in the case tending to show that the car in question should have been put on track 18 instead of track 17, nor do we understand from the testimony that Gibbony was bound by his directions to send the car on 17, even if it was numbered 17. The yard-master and the foreman both concurred that it was the duty of the switchtender to so line the switches that the cars would not corner, and there was

much substantial evidence to justify the jury in finding that Gibbony from his position could see that the cars did not clear. In other words, that the stationary car on 18, owing to the proximity of the tracks, would necessarily collide with a car sent in on track 17, and if under these circumstances Gibbony sent the cars down on track 17, he was negligent in so doing, and if so the defendant became and is liable to plaintiff for this negligent act of his fellow-servant under the provisions of section 2873, Revised Statutes 1899, commonly called "The Fellow Servant's Act."

II.   But it is insisted that even if Gibbony was guilty in switching the moving cars on to track 17 instead of track 18 and thereby causing the cars to corner, the plaintiff was guilty of such contributory negligence that will bar his recovery.   It is earnestly argued that as he was an experienced railroad switchman, having been in the railroad business for more than twenty years and half of that time engaged in switching, and was familiar with the tracks in the yards where the accident occurred, and knew the proximity of tracks 17 and 18, and that if a car should be pushed on to track 17 it would corner with a stationary car on track 18, it was his obvious duty to watch the approaching car to see which track the car was on, and that if he had been looking to see which track the car was on he would have discovered that it was on track 17 in time to have removed his hand from the lever and thus avoided the accident.   We are cited by the learned counsel for the defendant to numerous decisions of this court to the effect that where the established physical facts and common observation and experience conflict with the testimony of a witness, his testimony must yield and cannot be accepted as the basis of a verdict or judgment.   [Hayden v. Railroad, 124 Mo. 566; Kelsey v. Railroad, 129 Mo. 362; Huggart v. Railroad, 134

Mo. 679; Payne v. Railroad, 136 Mo. 583; Petty v. Railroad, 179 Mo. 666.]

That these cases announce the law of this State, there can no longer be any doubt. Whether a given case falls within the rule therein announced must be determined by the facts in each case. The evidence on the part of the plaintiff, corroborated by that of the defendant, established quite conclusively that just prior to the accident plaintiff was busily engaged at his work in switching and coupling cars on track No. 8, and then hurriedly ran from track No. 8 to the stationary car on track 18 and took his position at the east end of said car facing north with his right hand holding the lever as his duty required, and pulled down the lever from the catch and held it waiting for the drawheads to come together. He testified he then looked east and the west end of the backing train appeared to be within about six feet from him moving at a pretty good gait; he held his lamp in his left hand, it was very dark at the time, and there was no light of any kind except the switchmen's lamps. Having seen the car very close to him and supposing it was on track 18, he then directed his eyes to the coupling. He testified that under these circumstances it was his business to look right at the lever with his hand in position to make the coupling. Mr. Maroney, the yard-master, corroborated the plaintiff as to the propriety of the position he had taken at this time. The plaintiff testified that he did not look down at the rails at this time, but looked at the approaching car and supposed it was on track 18. It is insisted by the defendant that had plaintiff looked at the tracks he could not have failed to have discovered that it was on track 17, but in the light of all the evidence, when the darkness of the night, the proximity of the tracks and the character of the approaching car are taken into consideration, we do not think it can be conclusively asserted that if the plaintiff had looked at the tracks he would have

been able to have determined upon which track the approaching car was. But it is said, that he had his lamp with him and that had he shifted his lamp into his other hand he could have thrown his light far enough to have enabled him to do so in time to have saved himself from the injury. On this point Maroney testified that one in the position of the plaintiff in the darkness of that night could not have distinguished the rail over ten feet distant; that one could see ten feet by holding his lamp up, but in measuring the duty of the plaintiff at this time regard must be had to the duty at that moment devolving upon him. The conditions surrounding him required prompt attention, while it might have been a physical possibility for him to have discovered that the approaching car was on track 17 instead of 18 it must be remembered that with a car only six feet away, and the duty of watching the lever and the coupling to make, by the time he had lifted his lamp and brought it around from the left side of his body into a position to make the examination that Maroney would seem to show was necessary, the collision would have happened. But this is not all: as an experienced switchman he knew it was the duty of the switchtender to so line the switches that the cars would not corner and collide, and plaintiff had the right to presume that the switchtender was attending to his duties, and would not send a car down on track 17 when it would inevitably corner with the stationary car on track 18. In view of all the evidence and keeping in mind the perilous nature of the plaintiff's employment and that his duty required his whole attention, we think that whether he was negligent was a question of fact for the jury, and the circuit court properly submitted that question to the jury. The plaintiff was where his duties required him to be, that he had assumed a proper position to make the coupling there can be no doubt, the work before him required promptness, and but for the negligent action of the switch-

tender, he would not have been injured. Under like circumstances this court has, on numerous occasions, held that whether he was guilty of contributory negligence was a question of fact for the jury. [Cambron v. Railroad, 165 Mo. 543; Hollenbeck v. Railroad, 141 Mo. 110; Young v. Waters-Pierce Oil Co., 185 Mo. 668; Barry v. Railroad, 98 Mo. 70; Hamilton v. Rich Hill Mining Co., 108 Mo. 364; Wright v. Kansas City, 187 Mo. 678.]

III. But again, defendant asserts that the plaintiff assumed the risk of the injuries he received and therefore cannot recover. This contention seems to be based largely upon the fact that the witnesses testified that it frequently happened in railroading that cars did corner on tracks like these. As to this, in the first place, it may be said that the circumstances in which it was said cars frequently cornered were widely different from the facts in this case. Mr. Carson, who testified as an expert for the defendant, was speaking of cases in which cars were kicked on different tracks, and owing to the fact of the brake-beam adhering close to a wheel one car would not run as rapidly as another, and might stop before reaching a proper point, and the next car on another track would corner with the car that stopped, and sometimes one car would run faster than another and thus corner with it while both were running, but in this case the evidence shows that the stationary car on track 18 had been standing some time before plaintiff was injured.

Mr. Maroney, the yard-master, testified that it was the duty of the switch-tender to line switches and see that they did not corner, and if they did corner in the circumstances like those in evidence in this case, it was a violation of the rules.

Zibble testified that it was the duty of the switch-tender to see that the cars did not corner, and the switchman had to depend on that and did depend on it.

It did not appear from the evidence that the cornering of cars under circumstances such as these was a frequent occurrence, but if such had been the case, it was a violation of the duty which the defendant through its switch-tender, Gibbony, owed to plaintiff. The plaintiff did not assume the risk of the negligence of the defendant acting through its switch-tender. In the recent case of Curtis v. McNair, 173 Mo. l. c. 280, this court summed up the law on this point, saying: "It is the duty of the master to exercise reasonable care commensurate with the nature of the business to protect his servant from thhe hazards incident to it. [Williams v. Railroad, 119 Mo. 316; Rodney v. Railroad, 127 Mo. 676; Herdler v. Buck's S. & R. Co., 136 Mo. 3.] This duty the law imposes on the master and will not allow him to cast it off. It is contrary to public policy to allow the master to relieve himself by contract from liability for his own negligence. What the law forbids to be done by express contract it will not assist to be done by implying a contract. A risk which the law on the ground of public policy will not allow the servant to assume it will not imply from his conduct that he has assumed. [Blanton v. Dold, 109 Mo. 64; Settle v. Railroad, 127 Mo. 336; Pauck v. St. L. D. B. Co., 159 Mo. 467; Wendler v. People's House Furn. Co., 165 Mo. 527.] The servant never assumes the risk of the master's negligence."

This point must likewise be ruled against the defendant.

IV. For the plaintiff the court gave the following instruction: "The jury are instructed that if they believe and find from the evidence that on September 15, 1901, the plaintiff, George L. Phippin, was attempting to couple a certain stationary freight car, to a certain moving car backing toward the same, for the defendant railroad company, and his right hand and wrist were caught between the corners of said cars and

injured, and that the said injury was caused by the negligence and carelessness of the switch-tender, in throwing the switch for track No. 17 instead of track No. 18, thus causing the corners of the car at which plaintiff, Phippin, was standing, to collide and come together with force and violence, and that the plaintiff at the time was in the exercise of ordinary care himself, then your verdict must be for the plaintiff.''

The defendant urges that this instruction was erroneous in that it assumes that throwing the switch for track 17 was a negligent and careless act. We do not think the instruction is obnoxious to this criticism. We think it plainly required the jury to find that the injury was caused by the negligence and carelessness of the switch-tender. An instruction in all respects similar to this was sustained in Dammann v. St. Louis, 152 Mo. 186; see, also, Geary v. Railroad, 138 Mo. 251; State v. Grayor, 89 Mo. 605; O'Connell v. Railroad, 106 Mo. 482.

V. Finally it is urged that the verdict is excessive and obviously the result of passion, prejudice and undue sympathy. On this point the evidence shows that plaintiff was an experienced brakeman. By the accident his right hand was crushed, so that it had to be cut away, leaving nothing but the thumb, which was stiff and a useless deformity. He was confined to the hospital for a period of six months, and underwent intense pain and suffering, and at the time of the trial parts of the stump were still raw and unhealed; he had not been able to do any work whatever since the injury and was permanently disabled from ever afterwards following his vocation.

Prior to and at the time of his injury he was receiving $90 per month from the defendant. Obviously it was the duty of the jury in the first place to consider and assess the amount of damages which plaintiff suffered by the loss of his right hand and the pain and

suffering which he had endured. And while it is true that this court will scan the evidence to ascertain whether a verdict is the result of passion or prejudice, and will set it aside entirely or will compel a remittitur where the amount is utterly disproportionate to the conceded injuries in the case, in each case it must depend upon the facts peculiar to it. Each case presents its own merits or demerits, and little assistance can be received from what has been done in other cases. A long list of cases has been cited by the respective counsel in this case. In Dougherty v. Railroad, 97 Mo. 647, the plaintiff was a manager of a telegraph company, his salary was $144 per month, he lost his left arm in consequence of a violent jerk of a street car on which he was riding. During his illness his employers continued him his salary. The evidence tended to show that his usefulness as a telegraph operator was greatly impaired, to the extent perhaps of one-half. The verdict was for $12,000. This court quoted with approval from the opinion in Waldhier v. Railroad, 87 Mo. 37, as follows: "It is a matter of much difficulty, in such cases as this, to tell when the verdict is or is not excessive. . . . The amount of damages must be left largely to the reasonable discretion of the jury." In that case, where the plaintiff had lost both legs, a verdict of $25,000 after a remittitur for $5,000 and the accrued interest, was suffered to stand. In the case of Porter v. Railroad, 71 Mo. 66, where the injuries to plaintiff resulted in the amputation of one leg and two toes of the other foot, a verdict for $10,000 was not disturbed. In Chitty v. Railroad, 166 Mo. 443, a verdict for $15,000 was reduced to $10,000 and affirmed, where the injury was a compound fracture of the leg, which had never fully healed, but plaintiff could put cotton in his shoe and "walk by the aid of a stick, without any particular trouble."

In Hollenbeck v. Railroad, 141 Mo. 113, one of the plaintiff's legs was mashed and had to be amputated

three times.  The verdict was for $10,000 and was permitted to stand.  When the nature and character of plaintiff's vocation in life is considered, the loss of his right hand was tantamount to a permanent deprivation of the means of earning a livelihood.  He was forty-four years of age, and he was left in a deplorable condition for the future.  When compared with the injuries for which others have been allowed $10,000, we think there is nothing in the verdict which would justify us in holding that it was the result of passion or prejudice. We have given this record a careful consideration and in our opinion the judgment should be and is affirmed.

All concur.

### ON MOTION FOR REHEARING.

PER CURIAM:  A motion for rehearing was filed in this cause and leave obtained to file a brief in support thereof, to which plaintiff has replied.    Every proposition except one was ably argued and briefed on the original hearing.  As to those we see no reason to change our views except as hereinafter stated.

One new point is urged in the brief and that is as to the construction of the Fellow-Servant Act of 1897. A careful reading of the motion for rehearing will show that no such proposition was in the mind of the able and distinguished counsel who drew it.  Moreover, no stress was ever made on this point, either in the circuit court or this court, until weeks after our decision had been promulgated.  To recognize the practice of injecting into a case for the first time after a final judgment and opinion by the Supreme Court a new proposition, would be subversive to all our rules of practice and directly in the teeth of our rules.  For this reason we must and do decline to enter upon the discussion of the proposition as to the act of 1897.

After a careful reconsideration of the defendant's insistence that the verdict is excessive, it appears to

us that the verdict is too large. While we recognize that it is the duty of the jury to find the amount of damages, it is now the accepted law of this court that a *remittitur* may be required where, in the opinion of this court, the verdict is excessive. Accordingly, our opinion is modified and the judgment affirming the judgment of the circuit court is set aside, and it is ordered and adjudged that the judgment of the circuit court of Jackson county in this cause be reversed and the cause remanded on the ground that the verdict and judgment is excessive, unless within twenty days from this date the plaintiff shall remit three thousand dollars of said verdict and judgment as of the date of the rendition thereof, to-wit, June 23, 1902, but if plaintiff shall file such *remittitur* in the office of the clerk of this court within said time, then the judgment for the balance, to-wit, $9,000, and interest at the rate of six per cent from June 23, 1902, is affirmed.