CHRISTIAN LOOS, Plaintiff, *v.* CITY OF NEW YORK and Others, and NORTH SHORE BUS CO., INC., Defendants.

Supreme Court, Special Term, Queens County, January 31, 1939.

*Chamberlain, Clark, Buchner & Willi* [*Lloyd Paul Stryker, John Holley Clark, Jr., Herbert Stern* and *Raymond C. Murphy* of counsel], for the plaintiff.

*William C. Chanler, Corporation Counsel* [*Herman Horowitz, Robert W. Lishman* and *William Mason Smith, Jr.*, of counsel], for defendants other than the North Shore Bus Co., Inc.

*Jacob I. Goodstein* [*Jacob I. Goodstein, Isidore Zamore* and *Benjamin William Mehlman* of counsel], for defendant North Shore Bus Co., Inc.

*Jackson, Fuller, Nash & Brophy*, for the New York World-Telegram, Inc., *amicus curiæ*.

*Guggenheimer & Untermyer*, for the New York Post, Inc., *amicus curiæ*.

KADIEN, J. This is a taxpayer's action brought under section 51 of the General Municipal Law against the city of New York, the public officials constituting its board of estimate (hereinafter referred to as the "board"), and the North Shore Bus Co., Inc. (hereinafter referred to as "North Shore").

The plaintiff seeks to have declared void the contract executed by the mayor on behalf of the city with the North Shore for the operation of buses in the so-called Zone D District in Queens county, and the resolution of the board adopted on December 8, 1938, authorizing it, and also to restrain North Shore from establishing, maintaining or operating any bus lines pursuant to such contract.

While the plaintiff has, in his prolix complaint, gone far afield to assail the action of the board in passing the resolution above

referred to, his trial counsel has properly confined the proof to the basic elements of the action — that the legal requirements precedent to the issuance of the particular grant or contract here involved were not complied with. The fact that the plaintiff herein is and for five years last past has been an employee of Bee Line, Inc. (one of the seven petitioners for the contract ultimately awarded to North Shore), which company will, in consequence thereof, be supplanted as one of the present non-franchised operators of bus lines in the district affected, is immaterial. Whether each of the several requirements of chapter 14 of the New York City Charter was met is the sole concern of the court in determining the issues here presented, for, as was said in *Blanshard* v. *City of New York* (262 N. Y. 5, 12), " if it be true that these formalities and requirements were not met by the Board of Estimate and Apportionment, then the alleged grant of the rights in the streets was void and illegal."

Judge CRANE, writing the opinion of the court in the *Blanshard* case, succinctly summarized the things which were required to be done under section 74 of the Greater New York Charter (now substantially embodied in chapter 14 of the New York City Charter, in effect January 1, 1938), " before any grant of a ' franchise or right ' to use any street shall be made," as follows:

" (1) A public hearing shall be held upon the petition therefor.

" (2) The Board of Estimate and Apportionment shall make inquiry as to the money value of the franchise.

" (3) The Board shall make inquiry as to the adequacy of the compensation proposed to be paid therefor.

" (4) The Board shall embody the result of such inquiry in a form of contract.

" (5) The Board shall hold a public hearing on the proposed contract after public notice."

In asserting the alleged failure to comply with the statutory requirements of the charter, in the grant under consideration, the plaintiff has presented six principal points of non-compliance, which the court will dispose of separately:

(1) That there was no public hearing upon the petition " therefor " because there was no petition for a " terminable permit," which is what the North Shore was actually granted in the contract.

This point is predicated upon the fact that the petition of North Shore did not in so many words request a contract containing a terminable permit. It is contended that the hearing on the petition, under section 368 of the New York City Charter, must be had upon a petition which in so many words requests the very contract which is ultimately entered into. It is argued that what was requested

by North Shore in its petition was a contract for a definite or fixed term — what it received was a terminable permit with no fixed term; therefore, the hearing upon such a request was not a compliance with the statutes requiring a hearing on a petition " therefor."

On the other hand, the defendants urge that all that a petition for this form of franchise need contain is a request that the city grant the petitioner a contract; the exact character of contract, the precise terms and form of contract — that is for the city to determine after the hearings and procedure prescribed by the statute.

With this contention I am in accord. Section 368 of the New York City Charter requires no particular form of petition, nor is there anything therein prescribed as to what the petition must contain.

As said by Mr. Justice COTILLO in *Tompkins Bus Corp.* v. *LaGuardia* (156 Misc. 651; affd., without opinion, 246 App. Div. 714 [1st Dept.]), at page 653 of the Miscellaneous Reports: " The charter requires merely a petition for the grant of a franchise. It does not state that the terms and conditions of the franchise are to be included in the petition or to be published as part of the petition. If the board of estimate and apportionment could proceed to grant the franchise immediately after the hearing held upon the return day of the petition, there might be considerable justification for reading into section 74 an implied requirement that the petition contain the terms and conditions of the contemplated grant. * * * On the contrary, that section requires the board, at the hearing upon the petition, to ' make inquiry as to the money value of the franchise or right proposed to be granted and the adequacy of the compensation proposed to be paid therefor ' and to ' embody the result of such inquiry in a form of contract, with all the terms and conditions, including the provisions as to rates, fares and charges,' which proposed contract is to be published in full prior to ' a public hearing thereon at which citizens shall be entitled to appear and be heard.' Ample opportunity is, therefore, afforded to the public after the hearing upon the petition and to appear and be heard in respect to the terms and conditions of the proposed grant."

The petition which was involved in the last cited case was described in the court's opinion (pp. 652, 653) as " an application for a franchise to operate buses upon routes described in detail in the petition, but contained nothing else. No mention was made of the term of the proposed franchise, of the conditions upon which it was to be granted, or of the compensation to be paid." In the instant case the advertised petition of North Shore, dated June 27,

1938 (Plaintiff's Exhibit 1), stating simply " We hereby apply for a franchise for the following routes " (enumerating such routes), is similar to that in the *Tompkins* case, which, in turn, was similar in form and contents to petitions which for a number of years had been used " to initiate all franchise proceedings under section 74 of the Charter " (p. 654).

It was said in *City of New York* v. *New York City R. Co.* (193 N. Y. 543, 549): " So, when the meaning of a statute is doubtful, a practical construction by those for whom the law was enacted, or by public officers whose duty it was to enforce it, acquiesced in by all for a long period of time, in the language of Mr. Justice NELSON, ' is entitled to great if not controlling influence.' "

The fact that North Shore in its petition requested a " franchise " and in its contract received a " terminable permit," does not render the petition invalid, for, in my opinion, a terminable permit is a particular type of franchise. The charter itself employs the terms " franchises," " rights," " contracts," as describing the same thing — the granting of a right involving the occupancy or use of the city streets. Section 362 thereof vests in the board of estimate " the exclusive power in behalf of the city to grant franchises or rights or make contracts providing for or involving the occupation or use of any of the streets of the city." In *Beekman* v. *Third Ave. R. R. Co.* (153 N. Y. 144, 152) " the right or privilege of constructing and operating railroads in the streets " was called a franchise. In *Blanshard* v. *City of New York* (*supra*, at p. 9) the court said: " While these rights are called ' franchises,' or ' secondary franchises,' they are really rights, kept and maintained on certain conditions." In *New York Central El. Corp.* v. *Public Service Comm.* (264 N. Y. 230) the term " franchises " was defined as " consents." And in *Greenberg* v. *City of New York* (152 Misc. 488, at p. 500) the court stated: " There has recently (1928) been enacted section 69 of the Transportation Corporations Law. *The new section provides for a new new sort of revocable franchise called a ' terminable permit.' "* (Italics mine.)

It is, therefore, apparent from the foregoing that the term " franchise " is one of broad connotation, and includes any right to operate on or use the streets of the city which the duly constituted authorities may confer under the charter.

The board's director of franchises, moreover, testified that revocation clauses in bus franchises were not novel; that in 1933 he " prepared twenty contracts, all of which contained revocation clauses," and that " in 1934, there were six prepared, containing revocation clauses; " that he found " no distinction between ' franchise ' and ' terminable permit ' — the words were inter-

changeable." That it had always been the custom for the board to determine entirely the form and terms of the contract and that generally petitioners for the right to operate buses received less than what was requested.

An examination of the contract which the plaintiff seeks to invalidate supports this witness' testimony that there is no distinction between a " franchise " and a " terminable permit." (Plaintiff's Exhibit 11. See, also, Plaintiff's Exhibit 19.) While the comparative analysis of this contract with those in Zones A, B and C (Plaintiff's Exhibits 25, 26, 27), as set forth in the appendix to plaintiff's brief, shows certain changes, nevertheless we there find synonymous use of such terms as " franchise, right and consent; " " ' permit ' shall mean ' right, privilege, consent and permission granted to the company;'" " franchise or permit; " " permit, right and consent hereby granted," etc. In my opinion such changes as do exist do not destroy the essential " *franchise* " character of the North Shore contract.

(2) The board did not make an inquiry as to the money value of the franchise nor as to the adequacy of the compensation proposed to be paid therefor; that is, of the contract which was granted to the North Shore. (New York City Charter, § 369.)

In paragraph 40 of the complaint the plaintiff charged, among other things: " That the said Board of Estimate did not honestly in good faith or in fact make inquiry into the value of the right granted and did not legally, properly and in good faith embody the results of said inquiry in said contract." In his trial brief, however, he conceded that the board " had spent years in inquiring into the whole subject of buses in Queens." And in paragraph 35 of the complaint he alleged: " Said Board of Estimate had made inquiry into the value of the franchise in said zone for many years and after long consideration thereof had determined that the value of a fixed term franchise for a five-year period, with an additional period of five years during which the contract would be terminable on ninety days' notice, was not in excess of 5% of the gross income from such operation during the first two years, 6% during the next three years, and 7% during the balance of the term of such franchise."

In other words, the claim of the plaintiff is not that the board had not made any inquiry at all into the bus situation, but that it had not made a particular inquiry on the terminable permit which is embodied in the contract with North Shore.

Of course, this court is not interested in what factors influenced the board to grant this contract, or its reasons or motives for so doing. The wisdom and the business judgment exercised by the

board is not reviewable. All that the court is concerned about is whether the law was complied with. (*Blanshard* v. *City of New York, supra*, at p. 13; *People ex rel. McLean* v. *Flagg*, 46 N. Y. 401, 405.) It was said in the *Greenberg* case (*supra*, at p. 507): " The charter does not require that the board shall *determine* what the money value of a franchise is, nor that the board shall *fix* the money value of a franchise. The requirement is only that the board shall *make an inquiry* into the money value and the adequacy of compensation."

To uphold the contentions of the plaintiff would be tantamount to ruling that the board of estimate should have disregarded everything it had learned in reference to buses as a result of the many inquiries made by it on " the whole subject of buses in Queens," and start anew in relation to the contract which was granted to North Shore.

It is clear both from the *Blanshard* case (*supra*) (where it was charged that the board " failed to make *any* inquiry "), and from the *Greenberg* case (*supra*, at p. 511), that " All that the board is required to do is *to make an inquiry.*"

That an inquiry was made has been conclusively established by the official journals of the board of estimate. The journal for August 18, 1938 (Plaintiff's Exhibit 18) reads in part as follows: " Resolved, That the results of the inquiry made by this Board as to the money value of the proposed permit, right and consent, and the adequacy of the compensation proposed to be paid therefor, and of the terms and conditions, are as specified and fully set forth in and by the foregoing form of proposed contract for the grant of such permit, right and consent." And the journal of the board's meeting on December 8, 1938 (Plaintiff's Exhibits 16, 17) records the resolution authorizing the execution of the contract to North Shore, which, in part, is as follows: " Whereas, The Board has made inquiry as to the money value of the permit, right and consent applied for and proposed to be granted to the North Shore Bus Co., Inc., and as to the adequacy of the compensation proposed to be paid therefor." These recitals in the board's journals were held early in the trial to be conclusive evidence of the acts which were required to be done precedent to the granting of the permit to the North Shore. The court sustained the defendants' objections to the plaintiff's offer of proof " to vary, contradict or otherwise impeach the facts recited." (See opinion on the conclusiveness of such journals, 170 Misc. 104.)

Moreover, the board's director of franchises testified that he had in his official capacity made an inquiry, after the board had referred

to him the petition of the North Shore for investigation, and that he made his report in the nature of a form of contract.

(3) The board did not " embody the result of such inquiry in a form of contract, with all the terms and conditions, including the provisions as to rates, fares and charges." (New York City Charter, § 369.)

The plaintiff argues that the embodiment of the result of such inquiry in the form of contract, etc., which the director of franchises submitted to the board of estimate, and which is referred to in the resolution spread on the board's journal for Deecember 8, 1938 (Plaintiff's Exhibits 16, 17), does not come within the ruling of the court as to the conclusiveness of the recitals in the official journal of the board, because " the supposed embodiment of the result of the inquiry was not such as was required by law." (Plaintiff's brief, p. 39.)

It is quite clear from an examination of section 369 of the New York City Charter that the board was required to " embody the result of such inquiry in a form of contract." Since it was required so to do, and since the board's journal for December 8, 1938 (Plaintiff's Exhibits 16, 17), records the adoption of a resolution which in part reads, " Whereas, the Board did embody the result of such inquiry in this contract which was spread upon the minutes of the Board on Thursday, August 18, 1938, together with the proposed resolution for the grant thereof," the court is of the opinion that this recital in the official journal of the board is conclusive.

(4) The meeting held on the afternoon of August 18, 1938, at the summer city hall at the World's Fair Grounds, was not in any true sense a meeting " open to the public " as required by subdivision c of section 62 of the New York City Charter; hence the resolution adopted at that meeting, spreading upon the minutes the proposed form of contract and the proposed form of resolution authorizing the same, is invalid.

Plaintiff's trial counsel conceded that the spreading of the proposed form of contract upon the minutes (See Plaintiff's Exhibit 18) came within the purview of the court's ruling with respect to the conclusiveness of the board's journal. It is contended, however, that the resolution spreading the contract on the minutes is invalid, because at a regular meeting of the board, held on the morning of August 18, 1938, a similar resolution failed of adoption, and the meeting was adjourned, at its close, to September 22, 1938; that then, without notice to the public, a meeting of the board was called for that very afternoon, at the summer city hall, World's Fair Grounds. Concededly such a resolution was then adopted by a

vote of fifteen to one with respect to each of the companies which had petitioned for a franchise for Zone D.

There is a presumption in our law as to the *regularity* of a meeting of an official body, where the propriety thereof is questioned. *City of Rome* v. *Whitestown Water Works Co.* (113 App. Div. 547, 549; affd., without opinion, 187 N. Y. 542) states the principle in the following language: "The presumption is that the special meeting of the common council was regularly held [citing cases]."

This presumption is applicable to the special meeting which the board held on the afternoon of August 18, 1938, and in my opinion plaintiff did not rebut it. He failed to establish that this meeting was not in fact open to the public.

A special patrolman of the World's Fair, a witness for the plaintiff, testified that signs had been erected indicating, by an arrow, the direction to the summer city building; that a large number of people would come into the summer city hall and that the patrolman's orders were that if " anybody wanted to go to the City Building or to the Summer City Hall, we directed them to the City Building and directed them to go through," and that no one was stopped who evinced a desire to go there, or who came to the grounds and stated that he had some particular business and wanted to go to some particular place.

It is apparent, therefore, that the meeting which was held in the summer city hall during the afternoon of August 18, 1938, was a public meeting, was held in a public place, was open to any one who desired to attend it.

Moreover, there is no requirement in the charter which provides that the spreading of the contract on the minutes of the board should be at a public meeting or at any particular place, or that any particular notice of such action must be given. All that section 370 of the New York City Charter requires is that " Such proposed contract together with the form of resolution authorizing the same shall, but not until after the hearing upon the petition, be entered on the minutes of the board of estimate."

(5) The meeting of September 22, 1938, when the public hearing on the form of the contract was held, was not properly constituted.

This contention is predicated simply upon documentary evidence, to wit, Plaintiff's Exhibit 13, consisting of the stenographer's minutes of the meeting, and Plaintiff's Exhibit 15, the journal of proceedings of that meeting. No further evidence was adduced.

Concededly, the mayor was out of the city that day, and the deputy mayor acted as a member of the board, in his place, pursuant to the written authorization required by section 9 of the charter.

Admittedly, at the commencement of the meeting, Mr. Morris,

the president of the council, was absent, and Mr. Cashmore, as acting president, presided in his place.

Plaintiff's Exhibit 13, at page 8 thereof, shows that Mr. Cashmore at that time announced that items numbered 4 to 9, inclusive, relating to contracts of the six companies petitioning for a franchise, including North Shore, " will be taken up at the end of the Board of Estimate, unless there are objections." There being no objections, the said items were laid over until later. When they were then taken up, Mr. Morris was present and occupying the chair. He had arrived and assumed the chair after nine matters, unrelated to the hearing on the form of contracts, had been passed upon. (See Plaintiff's Exhibit 13, p. 30.) The hearings on the form of contracts were not held until much later. (See Plaintiff's Exhibit 13, p. 100.) Proceedings covering seventy pages of the stenographer's minutes took place after the arrival of Mr. Morris before the hearings on the form of contracts were commenced.

It is difficult, therefore, to perceive how Mr. Cashmore was entitled to vote in place of the president of the council. Concededly, the mayor's right to vote at all meetings at this time had been deputed by him to the deputy mayor. Undoubtedly, there was a quorum of the board's membership present, and, if Mr. Cashmore had been permitted to vote with all members of the board of estimate present, other than the mayor, and the deputy mayor voting for him, the total number of votes would have been nineteen, or three more than the total number of votes possessed by the board.

Moreover, the hearings were confined solely to the form of contract of the six companies which had petitioned for the franchise. The contracts were not voted upon that day, and the three-quarters vote of the board required by section 372 of the New York City Charter was not necessary.

For these reasons, the claim of the plaintiff that the board was not properly constituted at this meeting is without substance.

(6) The publication of the original petition was invalid and improper.

The mayor had designated *The Long Island Daily Star* and the *New York World-Telegram* as the newspapers in which to publish the petition of North Shore. The plaintiff contends the latter newspaper is not, in the language of section 368 of the New York City Charter, " published in the borough or boroughs affected," that is, in the borough of Queens.

To factually support this contention he called to the stand the circulation manager of the *New York World-Telegram*. While this testimony established that the paper was printed and entered as second class mail in the borough of Manhattan, it also established

that it was issued and distributed substantially contemporaneously in all boroughs of the city of New York.

He testified that the whole paper is printed in each of three plants located in Manhattan, from which it is " sent by truck and train to all boroughs at the same time." The distribution system employed is a unit system; the paper is loaded on trucks and delivered to central distribution points and the distributor at each one of these points takes and distributes to the dealer and collects and takes care of the distribution of papers in his particular vicinity. He stated that the nearest distribution point to the main plant on Barclay street is the Hudson Terminal, where the papers arrive in eight to ten minutes after leaving the plant, depending upon traffic lights, and that the paper emanating from the branch plant at Second avenue and Forty-fifth street reaches Queens by truck, across the bridge in fifteen to twenty minutes, and across the Thirty-fourth Street Ferry in eight to ten minutes, " taking in waiting time." Also, " that the Woodside deliveries and Flushing and Jamaica * * * are at time ahead of, * * *, 168th Street and Broadway or 181st Street and Broadway, or Fordham Road and Concourse, or 207th Street and Broadway " — all important transit points.

As to the circulation of the *New York World-Telegram* in Queens borough, he testified that the average daily " lay down " in the borough was 21,000˙ copies. In addition, some " sixty-odd thousand " copies were carried into the borough, making the total daily circulation there in excess of 80,000. In the distribution of his paper, he stated that copies are placed in all rapid transit and railroad stations in Manhattan, from which trains leave and make their next stop in the borough of Queens, in order to reach the people going there. He then enumerated the principal newspapers published exclusively in Queens, describing the particular localities they served, and their total paid circulation.

From this testimony, the following conclusions may be made:

1. That the circulation of the *World-Telegram* is greater and its distribution more widespread in Queens borough, than any of the local newspapers, serving as they do particular localities in the borough.

2. That this newspaper reaches some distribution points in Queens as fast, and, in some instances faster than many distribution centers in Manhattan.

3. That the *New York World-Telegram* delivers, distributes and issues its paper for general circulation throughout the borough of Queens, promptly, regularly and constantly.

A newspaper, thus distributed, issued and circulated, in a borough that is in an administrative unit or subdivision of a municipal corporation such as the city of New York, is in my opinion *published in every part of the city* — no less in one borough than in another, or in that where it is also printed. We are dealing here with a newspaper which serves the component parts of a modern city which are neither independent in the governmental nor in the physical sense. They are interconnected by the most progressive system of rapid transit in the world; by highways, bridges and ferries, all lending promptness and certainty to the general distribution of a newspaper. Under such circumstances the word " publish " must be construed in the light of present conditions and modern methods of newspaper distribution rather than by analogy to the dictum of even eminent jurists handed down decades ago in other jurisdictions. In this State there has never been any judicial determination of this term as applied to New York city-wide newspapers.

I do not consider *Village of Tonawanda* v. *Price* (171 N. Y. 415 [1902]) as an adjudication contrary to the conclusion arrived at here, nor as a precedent conclusive òf the particular situation in this case. There, a newspaper prepared for distribution in an *entirely independent nearby village* was held not published in another village although dated at both, and brought over from the village where it was printed and prepared and mailed at the other village to subscribers there. The court adopted by quotation from *Leroy* v. *Jamison* (3 Sawy. 386) the rule laid down by FIELD, J., while sitting in the Ninth Circuit, to wit: " The place where a paper is first issued, that is, given to the public for circulation, and not the place where it is subsequently distributed, is to control in determining where it is published."

What has been held in the instant case is not violative of this rule, for the *New York World-Telegram* is one of the " great dailies published in the City of New York " which is " first * * * given to the public for circulation " in all of the boroughs making up the city of New York. The facts in *Leroy* v. *Jamison,* however, were unlike those present here. In an action to recover possession of real property situate in the county of Santa Barbara, the statute required the publication of notice in a paper published at a place nearest the land involved. It was published in the *Santa Barbara Gazette.* This paper was printed in the city of San Francisco, several hundred miles distant from the county of Santa Barbara, and was sent down to that county for distribution.

The rule in this State as to " printing " of a newspaper seems to be that in determining the place of publication it is immaterial

where the printing is done. (*Matter of Gainsway*, 66 Misc. 521; *Secor* v. *Village of Pelham Manor*, 6 App. Div. 236 [2d Dept].)

In the last analysis, the purpose of the statute is to give publicity of the proposed franchise to the public most affected, with due regard to the widespread and regular circulation of the newspapers designated. It would be anomolous to say that a city-wide paper of the character of distribution and circulation in the "borough affected," established in this trial, does not meet the requirements of the statute, while a local paper *limited* in its distribution and circulation to a *particular locality* in the borough, does meet such requirements. The statute is met if either type of newspaper is designated. But the more *effective* notice is given when, as here, *both* types are designated, where publication is required in two newspapers.

The plaintiff, having been unsuccessful in showing non-compliance with the requirements of the charter in relation to the contract granted to the North Shore for the operation of buses in Zone D in Queens county, and the proof having on the contrary established such compliance, judgment on the merits must accordingly be granted to the defendants, and the complaint of the plaintiff dismissed. Settle judgment on two days' notice.