Walter H. ALLEN et al., Respondents,

v.

GLOBE–DEMOCRAT PUBLISHING COM-
PANY, a corporation, Appellant.

No. 49089.

Supreme Court of Missouri,

Division No. 2.

April 8, 1963.

Motion for Rehearing or to Transfer to
Court En Banc Denied June 4, 1963.

Hocker, Goodwin & MacGreevy, Lon Hocker, St. Louis, for appellant.

Morris J. Levin and S. Sheldon Weinhaus, St. Louis, for respondents.

STOCKARD, Commissioner.

This appeal is taken from the judgment of the Circuit Court of the City of St. Louis wherein eighteen plaintiffs were awarded "dismissal pay" in various amounts totaling $27,180.60 alleged to be due pursuant to the terms of a collective bargaining agreement between the St. Louis Stereotypers' Union No. 8 of the International Stereotypers' and Electrotypers' Union, AFL-CIO (hereafter referred to as "Local No. 8"), of which all plaintiffs are members, and the St. Louis Newspaper Publishers' Association, of which the "Globe Democrat" was a member.

On February 21, 1959 certain employees of the Globe-Democrat who were members of the St. Louis Newspaper Guild, a labor union not directly affiliated with Local No. 8, went on strike and established a picket line at the Globe-Democrat's place of operations. All the plaintiffs voluntarily refused, or at least failed, to cross the Guild picket line and report for work, except Albert W. Ebeling who entered the Globe-Democrat building on the first day of the strike, stayed for a little less than an hour and then departed and did not again return. On February 21, 1959 the publisher of the Globe-Democrat sent a letter to each plaintiff in which he stated, among other things, "I regret very much that the Globe-Democrat will not be able to publish its Sunday edition because of a strike by the St. Louis Newspaper Guild. It does not appear probable that publication will be resumed in the immediate future." On the following day the president of Local No. 8 received a telegram from the Globe-Democrat in which it was stated that no "lockout" of the members of Local No. 8 existed, and that "Any Globe-Democrat employee member of your union who has presented himself today or continues to report for work at his accustomed place of work on his regular work days and hours will be put to work and paid his regular day's pay at the straight time rate until the work stoppage caused by the Newspaper Guild is ended or until further notice." The president read this telegram to the members of Local No. 8 at a meeting but none of the plaintiffs reported for work.

On February 27, 1959, while the Guild strike was still in progress, the Globe-Democrat sold to the Pulitzer Publishing Company (hereafter referred to as the "Post-Dispatch"), which published the St. Louis Post-Dispatch newspaper, its principal physical properties and entered into a contract with the Post-Dispatch whereby it

would print the Globe-Democrat newspaper "from the date when Globe-Democrat Publishing Company is prepared to resume publication following the settlement of the present strike of its employees." The sale resulted in a transfer to the Post-Dispatch of all of the equipment used by the plaintiffs in their previous employment with the Globe-Democrat as stereotypers. A notice by letter of this sale was furnished to each plaintiff and to the representative of Local No. 8 which stated, in part, as follows:

"To effect greater economy and efficiency in mechanical operation, The Globe-Democrat today entered into an agreement with the St. Louis Post-Dispatch under which The Globe-Democrat will be printed by the Post-Dispatch, when and if the Guild strike is settled.

"The sale is of the physical property only. The editorial, advertising, circulation and business departments of the two newspapers will be entirely separate. The Globe-Democrat will continue as a completely independent newspaper in every sense of the word.

"The consolidation of mechanical operations between competing newspapers finds great precedent in many cities throughout America, a list which we suspect may grow larger in the future as the mechanical costs of publishing a daily newspaper continue to rise. The editorial, advertising, circulation and business independence of these newspapers has not in any way been affected. I assure you that it will not be affected in St. Louis.

\* \* \* \* \* \*

"Members of the mechanical unions will be employed on a priority basis in the consolidated mechanical operation. If they all cannot be employed, the dismissal provisions of the current mechanical contracts will apply.

\* \* \* \* \* \*

"I can assure you that The Globe-Democrat will continue in the future,

as it has in the past, as an independent newspaper and as a mighty force for good in St. Louis, in Missouri and in America."

On May 27, 1959, the Guild strike terminated, and throughout the entire period of the strike the Globe-Democrat maintained the status of plaintiffs as employees, insofar as its contributions were called for under the Blue Cross-Blue Shield program and group life insurance program. None of the plaintiffs, with the one minor exception previously noted, worked for the Globe-Democrat during the Guild strike or after its termination. Most of the plaintiffs took employment as stereotypers with the Post-Dispatch.

The provision in the collective bargaining agreement under which plaintiffs seek to recover "dismissal pay" is as follows:

"ARTICLE VII

"Dismissal Pay

"Section 1. Any employe who has had a regular situation for more than one year who is laid off to reduce the force shall receive dismissal pay on the basis of one week's pay for each year of continuous employment.

"Section 2. In the event of merger, consolidation or permanent suspension of publication by any newspaper covered by this agreement all employes who lose employment thereby shall receive dismissal pay as follows:

"Employes who have held regular situations for more than six months but less than one year shall be paid six weeks' dismissal pay.

"Employes who have held regular situations for more than one year shall be paid twelve weeks' dismissal pay.

"Section 3. Dismissal pay shall be at the employe's regular straight time rate of pay as of the time of dismissal."

The collective bargaining agreement does not provide for "dismissal pay" to an em-

ployee in any and all situations wherein the employment status is terminated, other than those specifically excepted, as do some and probably most labor agreements. See Globe-Democrat Publishing Company v. The Industrial Commission, Mo.App., 301 S.W.2d 846; Talberth v. Guy Gannett Publishing Company, 149 Me. 286, 100 A.2d 726, 40 A.L.R.2d 1036; Matthews v. Minnesota Tribune Co., 215 Minn. 369, 10 N.W.2d 230, 147 A.L.R. 147; and the cases collected in the annotation at 40 A.L.R.2d 1044. Instead, the agreement provides for "dismissal pay" in only certain specifically defined and delimited situations, and in doing this the Globe-Democrat is relieved from the duty or obligation to make such payment in all other situations. Plaintiffs base their claim on the provision in Section 2 of Article VII of the agreement which obligates the Globe-Democrat to make payment of "dismissal pay" to "all employes who lose employment" in the event of the "permanent suspension of publication by any newspaper covered by this agreement." While they alleged in their petition that the Globe-Democrat notified them of their dismissal "and the permanent suspension of the *printing* of its own newspaper," their main instruction directed a verdict on the basis of a finding that there was "a permanent suspension of *publication* * * * as the term * * * appears and was used in the said collective bargaining contract." Our ultimate ruling makes it unnecessary to rule on certain questions presented by the Globe-Democrat concerning the submission of such an issue to the jury in that manner.

On this appeal the Globe-Democrat contends that the facts proved by plaintiffs do not authorize a finding of "a permanent suspension of publication." Plaintiffs contend, on the other hand, that (1) the allegation of a "permanent suspension of printing" is the ultimate fact from which the court and jury could find that a "permanent suspension of publication" occurred; (2) the use of the term "suspension of publication" in the collective

bargaining agreement which provided "for the performance of certain mechanical operations relating solely to printing has reference to, and in the context used is intended to mean and require as a necessary element, the physical act of cessation of the printing and other mechanical operations;" and (3) the term "publication" and its derivatives is in its various contexts synonymous with the term "printing" and its derivatives. Plaintiffs also argue that the Globe-Democrat "would have the court believe that the plaintiffs were expert lexicographers well aware of the fine etymological distinctions" between the words "printing" and "publish." This latter argument apparently is directed to the issue as to what the *parties* to the collective bargaining agreement intended when the terms thereof were negotiated and agreed to. While plaintiffs as third party beneficiaries are entitled to enforce the terms of the collective bargaining agreement inserted therein for their benefit, Baron v. Kurn, 349 Mo. 1202, 164 S.W.2d 310, 142 A.L.R. 787; 31 Am.Jur. Labor § 128, they are not parties to the agreement. They must rely on the terms of the agreement as agreed to by the parties thereto, and the agreement is subject to the same rules of interpretation as other contracts. 56 C.J.S. Master and Servant § 28 (41)a.

Our first impression was that the term "permanent suspension of publication" was plain, clear and unambiguous, that no construction was called for, and that this unequivocal language should be given its plain meaning and enforced as written. See Community Federal Savings and Loan Association of Overland v. General Casualty Company of America, 8 Cir., 274 F.2d 620, which sets forth the rule adhered to by the courts of Missouri. However, when considered in all the circumstances, and in view of the language of some court decisions, we conclude that it may reasonably be said that the phrase is fairly susceptible to different constructions, and we shall look to the circumstances, the purposes of the provision, and the context

in which used in order to ascertain the intent of the parties. Wilson v. Owen, Mo., 261 S.W.2d 19, 23; 56 C.J.S. Master and Servant § 28 (41)a. In support of their contention that the term "publish," and its derivatives, is synonymous with the term "printing," and its derivatives, plaintiffs quote from Webster's International Dictionary, 2nd ed. the definition of the word "publish" as follows: "To bring before the public, as for sale or distribution; esp.: a. To print, or cause to be printed, and to issue from the press, either for sale or general distribution, as a book, newspaper, piece of music, engraving, etc." They also quote from the same source the definition of the word "publication" as follows: "The issuing to the public of copies, now usually printed or similarly produced copies, of a book, engraving, or the like; hence, the business of printing, etc. such copies; * * *." However, the expression "etc." refers back to the previously stated activities, and the last phrase, when completed to give the full intended definition is, "the business of printing [and issuing to the public] such copies [that is, copies of a book, engraving, or the like]." These dictionary definitions are of limited help. We do not consider that they establish that the two terms are synonymous, but they do indicate that in some circumstances depending on their use they may have somewhat similar meanings.

Very few cases have been found which construe the words "publication" or "printing" in relation to newspapers. It may be said, with certain isolated exceptions subsequently noted, that the reported cases are generally to the effect that although the "words 'print' and 'publish' are often confused," the "word 'publish' cannot be construed to mean 'print,' " Wolfe County Liquor Dispensary Ass'n v. Ingram, 272 Ky. 38, 113 S.W.2d 839; there "is a distinction between printing a newspaper and publishing a newspaper" and a person "is not required to print a paper in order to publish same, but can have the printing done elsewhere," Cox v. First Mortgage Loan Co.,

173 Okl. 392, 48 P.2d 1060; a newspaper "might be printed but never published" and it is "published when put in general circulation," Lewis v. Tate, 210 Ark. 594, 197 S.W.2d 23; Wolfe County Liquor Dispensary Ass'n v. Ingram, supra; a newspaper is published at that place where it is first put in circulation "and not at the place where it is printed," Bardwell v. Town of Clinton, La.App., 180 So. 148; Vick v. Bishop, 252 Ala. 250, 40 So.2d 845; Madigan v. City of Onalaska, 256 Wis. 398, 41 N.W.2d 206; Addison v. Town of Amite City, La.App., 161 So. 364; State v. Briwa, 198 La. 970, 5 So.2d 304; in determining the place of "publication" it is immaterial where the printing is done, Loos v. City of New York, 170 Misc. 14, 104, 9 N.Y.S.2d 760, 774; and "it would strain every rule of construction beyond all reasonable limits to read the words 'printed' and 'publication,' which have well defined meanings, as being synonymous. Printing implies the mechanical art by which type is imprinted upon the paper, whereas, publishing means the conveying of knowledge of notices." Haban v. Suburban Home Mortgage Co., Ohio App., 57 N.E.2d 97, 100.

Turning to what we consider to be the limited exceptions, we find that this court in a nonadversary proceeding held that the statutory requirement that the supreme court docket "be printed in the county" where court is to be held required the docket to be published in a newspaper in Cole County. This result was reached after a review of an unusual history of the statutory requirement, and because, according to the court, the Legislature "unfortunately used the word 'printed' instead of the word 'published,' but meaning all the time a publication of our docket in a local newspaper." See In re Publishing Docket in Local Newspaper, 266 Mo. 48, 187 S.W. 1174, 1176, in which the opposite result was reached by a divided court with a dissent by Judge Graves, and In re Publication of Docket of Supreme Court, 266 Mo. 48, 232 S.W. 454, where the majority of

a divided court adopted the reasoning in the dissent filed in the earlier case. In Nebraska Land, Stock-Growing & Investment Co. v. McKinley-Lanning Loan & Trust Co., 52 Neb. 410, 72 N.W. 357, the statute required that a notice of foreclosure be "by advertisement in some newspaper printed in the county." The affidavit, which stated that the newspaper was "published" in the county was held sufficient because the object of the requirement of the statute was to give notice, and if the Legislature had in mind the distinction between "print" and "publish" it would not have selected the place of printing instead of that of publication to serve that purpose. State ex rel. Vickers v. Board of Com'rs. of Big Horn County, 77 Mont. 316, 250 P. 606, pertained to the authority of a county to contract for public printing with a newspaper published in the county which was actually printed elsewhere when the statute authorized a contract "with some newspaper, published at least once a week, and of general circulation, published within the county." It was held that while the statute used the word "published" the meaning depended upon the subject with which it was connected; that to publish a newspaper is "to compose, print, issue, and distribute it to the public;" that the purpose of the statute "was to compel the letting of printing contracts to local newspapers, in order that local capital and local labor should secure the benefits of the expenditure of money derived from local taxes;" and therefore the word "published" as used in the statute "evidently" meant "printed and published."

We conclude that the term "publication of a newspaper" when used in its ordinarily understood meaning and particularly when used by those familiar with the terminology used in the newspaper industry, refers to the business of causing a newspaper to be composed, edited, printed, and disseminated or distributed to the public. In order to "publish" a newspaper it is not essential that the "publisher" actually perform, as distinguished from contracting to have it done, each and every one of the above named operations. For example, we know that newspapers frequently reprint and publish articles previously written or composed which were obtained from other newspapers or news services, and the act of distributing the newspaper is frequently done by contract, particularly in large cities. There is no question but that the Globe-Democrat was "published" prior to the Guild strike. Yet, the "comic magazines" and the "Rotogravure" sections were printed at Buffalo, New York, and Louisville, Kentucky, respectively. After the Globe-Democrat entered into a contract with the Post-Dispatch the "Sunday supplement Green Sheet" was printed by the World Color Press in St. Louis, and certain portions of the Post-Dispatch were also printed by the World Color Press. To demonstrate that it is not an uncommon practice for a publisher to contract for the printing of its publication, the Army Times Publishing Company, which publishes, as that term is generally known, the "Army Times" and the "Navy Times" has those publications printed by the World Color Press in St. Louis. Other examples could be cited. Therefore, the fact that the Globe-Democrat terminated the practice of causing its newspaper to be printed by its own employees in its own building or plant did not result in a "permanent suspension of publication" as that term is generally known and understood.

While we do not consider it particularly persuasive, and certainly not controlling, the fact that the above distinction between publishing a newspaper and printing it was the general understanding on the part of those plaintiffs who testified is clearly evidenced by their testimony, and also by Mr. Leroy J. Selby, the president of Local No. 8 during the Guild strike, who testified that after that strike the Globe-Democrat resumed *publication* and the Post-Dispatch started to *print* the Globe-Democrat newspaper. It is true that Mr. William K. Luttrell, president of Local No. 8 at the time of trial, testified that "There is no difference as far as I'm concerned" between

"publication" and "printing," that it was his understanding that "publication" means "The printing of a newspaper," and that after the Guild strike he "would ascertain that [the Globe-Democrat] was circulated" and not published. However, he first testified that the basis for his opinion was the "Missouri Supreme Court Ruling" about which plaintiffs' attorney had told him on the previous day, and he then stated that aside from that ruling he based his opinion on "The fact that we [apparently meaning members of Local No. 8] are not there to print it, I don't know where the publication is coming from," and that he had had that opinion for "over two years." In this connection it also is interesting to note that in their petition plaintiffs allege that on February 27, 1959 the Globe-Democrat notified them of "the permanent suspension of the *printing* of its newspaper, but in the first paragraph of the petition they allege that at the time of the filing of the petition, April 15, 1959, which was before the Guild strike ended, the Globe-Democrat "*is* and was at all times *hereinafter* mentioned doing business * * * *publishing* a daily newspaper * * *."

As previously noted, in at least three court cases it has been stated that by reason of the particular attending circumstances "publish" and "print" may be construed to mean the same. The question is thus presented whether in this case we should consider that by use of the term "publication" the parties to the agreement really meant "printing" notwithstanding that as generally known and understood the terms have different meanings. We are convinced that we cannot. The collective bargaining agreement was the "result of negotiations between the parties," and while the identity of the representatives of the parties in the negotiations are not shown, the procedure was for a negotiating committee on behalf of Local No. 8 to meet with representatives of the two newspaper publishing companies comprising the St. Louis Newspaper Publishing Association. These persons unquestionably were familiar with the newspaper business and the terms ordinarily and regularly used in the industry. Article V of the agreement is entitled "Vacations," and it is therein provided, among other things, that "If an employe is discharged for cause, or in any other manner severs his connection with the office prior to taking an earned vacation, such vacation pay, including pro rata credits earned within that same year, shall be due and payable to him within one week from the date of such action." Mr. Selby testified that the term "the office" as here used meant the employee's particular employer. He also agreed that by this provision an employee would be entitled to "vacation pay" whether he quit his employment, was "fired," was laid off to reduce the force, or because he lost his job by reason of a "permanent suspension of publication." It is thus clear that when the parties desired to provide that "vacation pay" be given to an employee in the event of his termination of employment for any reason, the parties so expressed that intent in clear and unequivocal language. Plaintiffs argue, however, that they were employed to perform mechanical operations, and that pursuant to the collective bargaining agreement they could only do or be required to do work which "pertains to stereotyping," and it is "perfectly understandable, therefore, for stereotypers to testify that so far as they were *personally* concerned, they saw no difference between printing and publication." But, is this what those who negotiated the agreement meant by the words used? Our objective in construing the terms of the agreement is not to determine what the parties intended to say, but what they intended by what they did say. Chater v. Carter, 238 U.S. 572, 35 S.Ct. 859, 863, 59 L.Ed. 1462. See also Paisley v. Lucas, 346 Mo. 827, 143 S.W.2d 262. In the absence of some reason to require a different rule, and none here exists, "The test of the meaning, of words commonly used, should be their ordinary and popular meaning; and they should not be construed in the broadest sense possible to include meanings to which they would not be applied

by most people." Cleaver v. Central States Life Ins. Co., 346 Mo. 548, 142 S.W.2d 474, 129 A.L.R. 1094. For all we know, the negotiating committee for Local No. 8 may have insisted on a provision authorizing the payment of "dismissal pay" in the event of a termination of employment for any reason not the fault of the employee, which apparently is the usual provision or at least not an infrequent provision when severance pay is provided for in a collective bargaining agreement. On the other hand, the negotiators on behalf of the St. Louis Publishers' Association may have insisted that there be no provision whatever in the agreement pertaining to "dismissal pay," but as a compromise, with a full understanding by all the negotiators of the distinction between "publication of a newspaper" and the necessary mechanical arts involved in the "printing of a newspaper" it was agreed, by reason of each side surrendering a portion of its demands, that the agreement should contain the precise wording used. In interpreting a collective bargaining agreement we must construe them as written, not as we may think they should have been written, and certainly not by interpolating words in them which are not there.

We find nothing in the circumstances pertaining to the use of the phrase "permanent suspension of publication" to justify a conclusion that those who drafted and negotiated the terms of the agreement did not intend to use the term as generally known and understood in the newspaper industry, and such evidence as there is on the matter compels the conclusion that the term was so used and intended. When we examine the language in the collective bargaining agreement and construe it according to the applicable rules, we must and do conclude that there is no evidence that plaintiffs lost employment because of a "permanent suspension of publication" on the part of the Globe-Democrat, and for that reason the judgment is reversed.

BOHLING and BARRETT, CC., concur.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.

On Motion for Rehearing or to Transfer to Court En Banc.

PER CURIAM.

Plaintiffs present a motion for rehearing containing thirty assignments of error. In their suggestions in support thereof they discuss only the contention pertaining to the alleged "failure by the Court to apply federal substantive law in reaching its decision," and those are the only assignments which merit additional comment.

Plaintiffs contend that pursuant to Section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185(a), and the decisions of the United States Supreme Court this court was required to apply federal substantive labor law in reaching its decision. We have re-examined plaintiffs' brief and find that no federal statute was cited therein, not even Section 301(a), supra, and no federal cases whatever were cited. In the submission of this case they relied solely on state court cases, primarily those from Missouri. It has long been the rule that new propositions and complaints not submitted in the original briefs, Ford v. Wabash Ry. Co., 318 Mo. 723, 300 S.W. 769, 778, and raised for the first time after the opinion is handed down, Phippin v. Missouri Pacific Ry. Co., 196 Mo. 321, 93 S.W. 410, 418, or which are clearly afterthoughts, State ex rel. Cole v. Matthews, Mo., 274 S.W.2d 286, 292, will not be considered on motion for rehearing. We do not propose now to change or relax that rule. However, if in a suit in a state court by an employee against an employer on a collective bargaining agreement, we are required to apply "federal substantive law" and we did not do so, and the result reached is contrary to such law, then plain

error would have resulted. We may, in our discretion, consider plain error affecting substantial rights, Civil Rule 79.04, V. A.M.R., and on that discretionary basis we shall examine the contention, presented now for the first time, that we erred in not ruling the case pursuant to "federal substantive law" which plaintiffs at no time urged.

Section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185 (a), provides as follows: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." In Smith v. Evening News Association, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246, the United States Supreme Court, speaking through Mr. Justice White, stated that this section "has substantive content and that Congress has directed the courts to formulate and apply federal law to suits for violation of collective bargaining contracts." Quoting then from Local 174, Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593, the court also said: " 'The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements.' "

Plaintiffs assert that "Under federal law the courts may even interpolate * * * if the federal policy will be served thereby," and although they say "such is not needed here" they clearly imply that their understanding of federal policy is that they should not lose this litigation, and that we should read into the contract such nonexisting provisions as are necessary to carry out that policy. They say we "deviated from federal requirements" when we

applied "the same Missouri law that would be applied to all contracts regardless of their nature," and "had the court considered federal law and endeavored to reach a conclusion consonant therewith, the court should have found itself compelled to reach a contrary result." They further argue that the result of plaintiffs losing this litigation "would certainly never promote industrial stability or peace and can only be 'a breeder of discontent and unharmonious relations between employer and employees,' " and the "failure to consider the interests and position of the plaintiffs could never meet or satisfy the federal requirements or standards."

 We are not convinced that it is "federal policy" that in a suit of this nature we must interpolate into the contract such nonexisting provisions as may be necessary in order to enable plaintiffs to prevail regardless of the merits of their position. We shall, therefore, turn to the question of whether the result we reached in construing the terms of the contract as written is contrary to "federal substantive law." In their motion for rehearing plaintiffs cite not one federal case construing language of a collective bargaining agreement which was the same or similar to that construed in the principal opinion, and not one federal case is cited in the motion for rehearing which tends to hold that the result we reached is construing the contract as written is incorrect. In the preparation of the principal opinion we ruled the issues by giving the language of the contract its normal meaning in accordance with its accepted usage. In doing so we considered every case cited by plaintiffs, none of which were federal cases. In our research on the issues we studied and considered not only Missouri cases, but the federal cases and cases of other states pertaining to the issues. We found no federal case directly in point, but we cited two, a court of appeals opinion and an opinion of the United States Supreme Court, on related matters. Assuming, therefore, that in this suit we are required to apply federal substantive

law, it is our conclusion that we did so insofar as there has been a pronouncement thereof by the federal courts, and that we correctly applied it and the result reached is in accord therewith. There is absolutely nothing in Smith v. Evening News Association or any other federal case cited by plaintiffs in their motion for rehearing, which directly or inferentially holds that the result we reached is contrary to federal substantive law, and plaintiffs certainly have not demonstrated in their motion for rehearing that on the merits we reached an incorrect result. The motion for rehearing is overruled.

For the reasons set forth in the per curiam in Irwin v. Globe-Democrat Publishing Company, Mo., 368 S.W.2d 452, there is no federal question which requires or justifies a transfer of this case to the court en banc. No supreme court rule requires, and we find no reason to order, its transfer. The alternative motion to transfer to the court en banc is denied.