HUNTERDON COUNTY DEMOCRAT, INC., A NEW JERSEY CORPORATION, PLAINTIFF, v. THE RECORDER PUBLISHING COMPANY OF BERNARDSVILLE, A NEW JERSEY CORPORATION; AND READINGTON TOWNSHIP, A MUNICIPALITY OF THE STATE OF NEW JERSEY, DEFENDANTS.

Superior Court of New Jersey
Chancery Division

Decided December 10, 1971.

554

*Mr. Russell W. Annich, Jr.,* for plaintiff (*Messrs. Mason, Griffin & Moore,* attorneys).

*Mr. Henry M. Hoyt* for defendant The Recorder Publishing Company of Bernardsville (*Messrs. Hoyt, Jeffers & Weiland,* attorneys).

*Mr. William M. D'Annunzio* for defendant Readington Township (*Messrs. Gebhardt & Kiefer,* attorneys).

SEIDMAN, J. C. C. (temporarily assigned). The principal issue in this declaratory judgment action is whether defendant newspaper qualifies under *N. J. S. A.* 35:1–2.2 for the publication of official advertising.

Plaintiff Hunterdon County Democrat, Inc. owns and publishes a newspaper by that name which circulates generally throughout Hunterdon County, the principal office and place of publication of which is stated to be in the Borough of Flemington. Defendant Recorder Publishing Company of Bernardsville (Recorder) owns and publishes,

among other weekly newspapers, *The Hunterdon Review and The High Bridge Gazette (Review)*, which also has general circulation in that county, particularly in its northwest section, including Readington Township, the Town of Clinton and the Borough of Flemington.

Plaintiff contends that the *Review* moved its principal publication office from Whitehouse Station in Readington Township to the Town of Clinton in 1969, as a result of new ownership, and that in doing so the *Review* is no longer qualified to publish official advertising by virtue of the fact that it has not been published continuously in the township for the two-year period required by *N. J. S. A.* 35:1–2.2. The *Review* disputes this and contends it is qualified to publish official advertising.

Although the Township of Readington was joined as a party defendant because of a possible issue of the validity of its official advertising in the *Review,* the parties agreed at the time of trial not to have that issue adjudicated.

Having considered the testimony of the witnesses produced on each side, the exhibits and the depositions received in evidence by stipulation, the court is now required to announce its findings of fact and state its conclusions of law thereon. *R.* 1:7–4.

I

The court finds that until June of 1969 the *Review* was owned by Review Publishing Company and published by Raymond von Culin. All functions of the newspaper were performed at an office located on Main Street, Whitehouse Station, although there was a small branch in High Bridge. In 1968 von Culin obtained a variance for a building owned by him in Clinton permitting him to open an office and install printing presses in that location. On May 14, 1969 he announced the consolidation of the *Hunterdon Review* with the *High Bridge Gazette* and the proposed "relocation of the Review Publishing Company's plant and editorial and

advertising offices in Clinton." About a month later the name, circulation files and good will of the *Review* were purchased by Recorder.

For a short time thereafter the *Review* continued to operate at Whitehouse Station, but the printing of the paper was transferred to Recorder's plant in Bernardsville. On July 9, 1969 the *Review* opened an office in Clinton in space rented from von Culin and moved editorial personnel and a bookkeeper to that location, retaining at the Whitehouse Station office a full-time employee whose duties included some editorial work, preparation of advertising layouts, handling of classified advertisements and attending to circulation. In November 1969 he was replaced by an employee who functioned as circulation manager and classified advertising salesman, in addition to doing some news reporting. The editor of the newspaper, based in Clinton, spent part of each day in Whitehouse Station. Early in January 1970 a second employee was assigned to the Whitehouse Station office.

The newspaper has been issued every Wednesday during all periods in question, and has been prepared for distribution at the Bernardsville office (now at Stirling), where copies are bagged or bundled and loaded onto a delivery truck sent there from Whitehouse Station the preceding night. The truck proceeds by a prescribed route to various post offices, news-stand locations and other nonmail delivery points in the Hunterdon County circulation area, leaving bags or bundles of newspapers for distribution.

The *Review* has been entered as second-class mail matter under the postal laws and regulations at the Whitehouse Station Post Office. The depositing of bags at other post offices is by arrangement with the postmaster at Whitehouse Station.

From these basic facts it is evident that although a substantial part of the editorial and advertising operations was transferred from Whitehouse Station to Clinton after the change in ownership in 1969, the Whitehouse Station office was retained and staffed for the transaction of business.

## II

The qualifications of a newspaper for publishing official advertising are contained in *N. J. S. A.* 35:1–2.1 (state publications) and *N. J. S. A.* 35:1–2.2 (publications by counties, municipalities, individuals and corporations). The pertinent provisions of each are identical:

> * * * said newspaper or newspapers shall be entirely printed in the English language, shall be printed and published within the State of New Jersey, shall be a newspaper of general paid circulation possessing an average news content if not less than thirty-five per centum (35%), *shall have been published continuously in the municipality where its publication office is situate for not less than two years and shall have been entered for two years as second-class mail matter under the postal laws and regulations of the United States.* In case a newspaper cannot meet these qualifications itself; but has acquired another newspaper which meets these qualifications, the acquiring newspaper shall be deemed to meet these qualifications if it is published in the same municipality and entered in the same post office as was the acquired newspaper. [Emphasis supplied]

The only statutory qualification in dispute in this case is the one pertaining to continuous publication "in the municipality where its publication office is situate for not less than two years." Plaintiff argues that the place of publication of the *Review* was transferred to Clinton in July 1969 and that it thereafter ceased publication in Whitehouse Station. Defendant newspaper claims that it has been published continuously in the original location for the requisite period, despite the moving of some of the editorial and advertising operations to Clinton.

To place the issue in proper perspective, one should note that the problem before the court is not whether the *Review* is eligible for designation by Readington Township as an official newspaper for the publication of all advertisements and notices required by law to be published by the municipality. See *N. J. S. A.* 40:53–1. In such case the statutory requirement is that the advertisements be "published in at

least one newspaper published and circulating in the municipality, and if there be no such newspaper, then in at least one newspaper published in the county in which the municipality is located and circulating in the municipality." *N. J. S. A.* 40:53–2. There is, of course, a potential overlapping of issues, but not until it is first determined that the newspaper in question possesses the statutory qualifications for publishing official advertising.

A newspaper not qualified to publish official advertising cannot be designated by a municipality as its official newspaper. But one that is qualified may or may not be eligible for such designation, depending on whether it is published and circulated in the municipality, or if there be none so eligible, whether it is published in the county and circulated in the municipality.

The issue here is whether the *Review* has the requisite qualifications for official advertising, of which the pertinent one is that the newspaper shall have been *published* continuously in the municipality where its *publication* office is situate for not less than two years. The resolution of that issue requires interpretation of the words "publish," "place of publication" and "publication office."

As originally enacted, the statutory requirement was that the newspaper "shall have been published continuously for not less than one year and shall have been entered as second class mail matter under the postal laws and regulations of the United States." "*L.* 1935, *c.* 177, § 1, and *L.* 1936, *c.* 208, § 1. The period of continuous publication was increased to two years by *L.* 1938, *c.* 328, and subsequently a two-year period was prescribed for the entry as second-class mail matter. *L.* 1941, *c.* 147. The requirement of continuous publication *in the same municipality where its publication office is situate* appeared for the first time in 1941. *L.* 1941, *c.* 409.

Dictionary definitions of "publish" and "publication" are not too helpful. The *Random House Dictionary of the English Language* (1966) definies "publish" as:

1. to issue, or cause to be issued, in copies made by printing or other processes, for sale or distribution to the public * * * 2. to issue publicly the work of * * * 6. to issue printed editions, as newspapers, books, etc. * * *

"Publication" is defined therein as "the act of publishing."

Other definitions of "publish" are: "to bring before the public, as for sale; esp.: a. To print and issue from the press, as a book, newspaper, etc." *Webster's Collegiate Dictionary* (5th ed. 1939); "* * * prepare and issue copies of (book, engraving, publication) for sale to the public," *American Oxford Dictionary* (Am. ed. 1927). See also 35A *Words and Phrases* 150.

These definitions would have been adequate for the statute as it was worded prior to 1941, but the amendment adopted that year added another element to the general concept of publishing — *location*. Now one must know not only whether the act of publishing is being performed, but also where it is done.

The statute pertaining to legal newspapers has received infrequent judicial attention in this State. In fact, cases on the general subject of newspaper publishing are sparse in number. An early case, *Bayer v. Hoboken,* 44 *N. J. L.* 131 (Sup. 1882), aff'd 45 *N. J. L.* 185 (E. & A. 1883), dealt with an 1877 statute limiting the publication of municipal proceedings to designated newspapers printed and published in the city "that shall have been in existence and published in said city for over two years." Writs of *certiorari* brought up for review resolutions of the common council of Hoboken awarding the official printing to the *Hoboken Advertiser,* the contention being that the paper was not printed in the State. The facts were that the office of the newspaper was in Hoboken; the entire matter for the newspaper was composed, set up and placed in forms there and then sent over to New York for the press work, and the papers were brought back to the Hoboken office for issuance to subscribers. The court rejected as too narrow an interpretation of the act the argument that the newspaper was

not printed and published in Hoboken because the press work was done in New York. It held that the composition of the material, the setting of the type and preparing of the forms for the press work constituted substantial and important parts of the printing process, and that since this work was done exclusively in the Hoboken office, it was no misapplication of the statutory language to say that the paper was printed and published there.

*In re Bond Printing Co., Inc.,* 135 *N. J. L.* 478 (E. & A. 1947), involved an application for a declaratry judgment to determine the right of the *Asbury Park Sun* to continue to print and publish official advertising. The *Red Bank Daily Standard,* which had been published in Red Bank for a number of years, was purchased by Bond Printing Company, Inc., in 1945 and its name was changed to *Asbury Park Sun.* The *Standard* was discontinued as a newspaper and all of its equipment was transferred to a building in Asbury Park, and the *Sun* was first printed and published there in January 1946. The plaintiff argued that since it printed, published and issued a daily newspaper in Asbury Park, it was not subject to the limitation and restrictions imposed by *N. J. S. A.* 35:1–2.1 and 35:1–2.2. Its theory was that there is no statutory limitation on the domicile of a New Jersey newspaper, and once legal status had been attained, as in the case of the *Standard,* the name and domicile of the newspaper could be changed without the loss of its status.

The plaintiff conceded that for a newspaper to qualify for legal advertsiing it must be published continuously for not less than two years in the municipality where its publication office is situate, and also that the *Sun* had its publication office in Asbury Park only since January 1946 and was first published in that month. The court held that the *Sun* did not meet the statutory qualifications. It said:

Clearly, the intention of the legislature was to limit legal advertising only to those newspapers having stability and continuous existence in the municipalities where their publication offices are maintained, and, to qualify for such legal advertising, two years was determined

as the minimum period within which a newspaper must be in existence in such municipality.

In *Bayer* the court merely concluded that where all other operations of a newspaper are performed in a municipality, it is published there, even though the actual press work is done elsewhere. This is in accord with the generally accepted view in other jurisdictions that publication is not synonymous with printing. *Connerly v. Stephenson,* 181 *Ark.* 833, 28 *S. W.* 2d 60 (Sup. Ct. 1930); *Stanwood v. Carson,* 169 Cal. 640, 147 *P.* 562 (Cal. Sup. Ct. 1915); *Ricketts v. Village of Hyde Park,* 85 *Ill.* 110 (Sup. Ct. 1877); *State v. Bass,* 97 *Me.* 484, 54 *A.* 1113 (Sup. Jud. Ct. 1903); *Amos Brown's Estate, Inc. v. City of West Seattle,* 43 *Wash.* 26, 85 *P.* 854 (Sup. Ct. 1906). But see *Carter v. Land,* 174 *Ga.* 811, 164 *S. E.* 205 (Sup. Ct. 1932); *Petition of Christiansen,* 231 *P.* 2d 152 (Cal. App. 1951).

 The significance of *In re Bond Printing Co., Inc.* is that when a newspaper bodily moves all its operations from one municipality to another it does not take along its previously acquired status as a newspaper qualified to print official advertising. In that case, as well as in *Bayer,* the fact of publication in a particular municipality is either assumed or conceded. The terms "publish," "place of publication" and "publication office" are not defined.

As indicated above, for a newspaper to be eligible for official advertising it must be published within the geographic boundaries of the municipality wherein its publication office is situate.

### III

It is not in dispute that when ownership of the *Review* changed hands in June 1969 the newspaper possessed the statutory qualifications for printing the official advertising of a municipality. Until then it is evident that all the activities and operations of the newspaper, with the exception of a branch office in High Bridge, were conducted in White-

house Station. In support of its contention that as a result of moving the "principal office" to Clinton the *Review* was no longer so qualified, plaintiff advances the argument that the location of the editorial and business offices are the statutory criteria for determining the situs and office of publication, and that the statute itself reveals a legislative intent to equate both the place of publication and office of publication with the location of the business and editorial offices. The court is of the view that this concept is too broad.

██ ██ In one sense a newspaper is published in every place where it is circulated or its contents made known, but it is not in that general sense that the place of publication is used in a statute such as the one involved here. *Le Roy v. Jamison,* 15 *Fed. Cas. No.* 8,271, at 380 (D. Cal. 1875) ; *Wolfe County Liquor Dispensary Ass'n v. Ingram,* 272 *Ky.* 38, 113 *S. W.* 2d 839, 842 (Ct. App. 1938) ; *Village of Tonawanda v. Price,* 171 *N. Y.* 415, 64 *N. E.* 191 (Ct. App. 1903). A newspaper or magazine is often published at different times in different towns or cities, and in different places in the same city. *Perkins v. Keller,* 43 *Mich.* 53, 4 *N. W.* 559, 561 (Mich. Sup. Ct. 1880). See also *McFarlane v. Hulton,* [1899] 1 *Ch.* 884 (Eng). A newspaper may be published at a given place, within the meaning of one statute, and yet not meet the requirements for publication under a different statute. *State ex rel. Vickers v. Board of Com'rs,* 77 *Mont.* 316, 250 *P.* 606, 608 (Sup. Ct. 1926).

When a statute requires, in one form or another, that the publishing be in a specified place, it then becomes necessary to define the place of publication. It has been held elsewhere that a newspaper, in such case, is published at the place where it is first distributed to the public, *Madigan v. City of Onalaska,* 256 *Wis.* 398, 41 *N. W.* 2d 206, 208 (Sup. Ct. 1950) ; where it is first put into circulation, *Addison v. Town of Amite City,* 161 *So.* 364, 367 (La. App. 1935) ; *State ex rel. Vickers v. Board of Com'rs, supra;* where it is first issued, that is, given to the public for circulation, *Le Roy v. Jamison, supra;* where it is first put into circula-

tion, where it is first issued to be delivered or sent, by mail or otherwise, to its subscribers, *Polzin v. Rand, McNally & Co.,* 250 *Ill.* 561, 95 *N. E.* 623, 628 (Sup. Ct. 1911); *People ex rel. O'Connell v. Read,* 256 *Ill.* 408, 100 *N. E.* 230 (Sup. Ct. 1912); where it is entered in the post office and where it is first put in circulation, *Vick v. Bishop,* 40 *So.* 2d 845, 848 (Ala. Sup. Ct. 1949); *Bardwell v. Town of Clinton,* 180 *So.* 148, 150 (La. App. 1928); *State v. Briwa,* 198 *La.* 970, 5 *So.* 2d 304, 308 (Sup. Ct. 1941); *State v. Bass, supra,* 54*A.* at 1115. See also *Drainage Dist. No. 9 v. Merchants' & Planters' Bank,* 2 *S. W.* 2d 1079, 1081 (Ark. Sup. Ct. 1928); *Allen v. Globe-Democrat Publishing Co.,* 368 *S. W.* 2d 460, 464 (Mo. Sup. Ct. 1963), *State ex rel. Sun Company, Inc., v. Vigil,* 74 *N. Mex.* 766, 398 *P.* 2d 987, 991 (Sup. Ct. 1965); *Matter of Gainsway,* 66 *Misc.* 521, 522, 123 *N. Y. S.* 966 (Sup. Ct. 1910).

In this State the term "place of publication" was considered in *Montesano v. Liberty Warehouse Co,* 121 *N. J. L.* 124 (E. & A. 1938), the question being whether the *Jersey Observer,* within the meaning of the Uniform Warehouse Receipts Law, was published in Union City. The statute referred to required the advertisement of sale of goods for default in the payment of storage charges to be published once a week for two consecutive weeks in a newspaper published in the place where such sale is to be held. The court noted that the newspaper was printed in Hoboken and "its printing office is at least the main place of publication." A branch office was maintained in Union City, to which some of the papers were dispatched and from there locally distributed. The court held:

It is conceded that the printing is not done at the branch office, and it is also conceded that a newspaper may be published where it is not printed. It appears, however, that within the meaning of such statutes as that upon which we are now passing *the place of publication of a newspaper is where the paper is first put into circulation, where it is first issued to be delivered or sent, by mail or otherwise, to its subscribers. People ex rel. O'Connell v. Read,* 256 Id. 408, 100 *N. E.* 230; *State v. Bass* 54 *Atl. Rep.* 1113. To give the word such a

meaning as would bring within its application any newspaper circulating in a municipality would quite nullify the obvious intent of the legislation, for it is likely that there is no municipality in which newspapers from some source do not circulate, and we think that the maintenance of an office for convenience and expedition in effecting local distribution does not suffice to constitute publication. We are left with a very incomplete stipulation of the facts relating to the publishing incidents of the newspaper in question. But upon the record placed before us our conclusion is that the attributes of the office maintained in Union City and the characteristics of the distribution and circulation within that municipality were insufficient to constitute the statutory publishing. [Emphasis supplied]

In the case of *Wildwood, etc., Pub. Co. v. Wildwood,* 35 *N. J. Super.* 543 (Law Div. 1955), plaintiff questioned the legality of the publication by the City of Wildwood of legal notices printed in a newspaper published by defendant Cape May County Leader Co. The facts, as found by the court, were that plaintiff, whose main office and printing plant were in Wildwood, published and circulated *The Independent Record* in that municipality. Defendant Cape May Leader Co. published a weekly newspaper known as *The Wildwood Leader* and, since 1939, according to the newspaper masthead, had its general office in Wildwood, the same address also appearing in the statement of ownership, management and circulation required by federal statute. The newspaper was printed in the printing shop of the Cape May County Leader Co. in the City of North Wildwood. It was entered at the post office in Wildwood, and letterheads and billheads contained the Wildwood address. The managing editor had desks both at the Wildwood address and at the printing plant in North Wildwood. Mail was received either at a Wildwood post office box or at the Wildwood address. Sixty-five percent of the total distribution of the newspaper was in Wildwood. Newspapers were loaded on a truck at the North Wildwood printing plant and were first delivered to newstands and dealers in Wildwood, after which the balance of the newspapers was issued to dealers in North Wildwood. Mailing of the newspaper was at the Wildwood post office. After holding that both papers were circulated in Wildwood

and that plaintiff's paper was published and circulated in that municipality, the court ruled that the defendant's newspaper was also published there:

> The *Wildwood Leader* is first put into circulation in Wildwood. It is under the control of the publisher until delivered to the newsstands or newsdealers or deposited in the post office in Wildwood for mailing. It is first issued for public consumption in Wildwood, and only after the newspaper has been completely issued in Wildwood is it released to the public in any other municipality. I find, therefore, that not only is The Wildwood Leader circulated in Wildwood, but that its publication office has been there situated for upwards of two years and it has been published there for upwards of two years. It has been entered as second-class matters under the postal laws and regulations of the United States in Wildwood.

The most recent reported case is *Schultz v. Board of Education Wanaque*, 105 *N. J. Super.* 165 (App. Div. 1969), in which the issue was whether petitioner's newspaper was published in the Borough of Wanaque within the meaning of *N. J. S.* 18A:22–11, which required that publication of the notice of a school budget public hearing and of the statement annexed to the budget be in at least one newspaper published in the district. The court said:

> The 'place of publication of a newspaper is where the paper is first put into circulation, where it is first issued to be delivered or sent, by mail or otherwise, to its subscribers.' *Montesano v. Liberty Warehouse Co.*, 121 *N. J. L.* 124, 125 (E. & A. 1938). See also *Wildwood, etc. Pub. Co., v. Wildwood*, 35 *N. J. Super.* 543, 547 (Law Div. 1955). A newspaper may be considered published where it is not printed. *Montesano, supra*, 121 *N. J. L.* at *p.* 125.
>
> It is not disputed that a second-class mailing permit has been accorded to the *Bulletin* by the Wanaque post office since 1950. The paid circulation of the newspaper varies from 450 to 720 issues. Of this amount, 325 are mailed through the Wanaque post office. The balance are sold through three news-stands and carriers within the borough.
>
> Although the paper is printed in Butler and Riverdale, the *Bulletin* maintains an office (a counter and a desk) in a store in Wanaque. This office is listed on the masthead as the publication office. The office is open between 9:00 A.M. and 5:00 P.M. on weekdays and someone is there during these times for the transaction of business. Mail is received, news items are left, advertising space is ordered and paid

for, and bills are paid at those office. Further, some news articles are prepared for printing in the newspaper on these premises.

Under all these circumstances here present we find that the *Bulletin* is 'first put into circulation' in Wanaque. Consequently, we conclude that it is, within the meaning of *N. J. S.* 18A:22–11, published in that borough. * * *

■ From these cases it seems clear that "place of publication" relates to the dissemination of the newspaper, *i. e., to* its issuance, distribution and circulation. "Place of publication," however, should be distinguished from "publication office," as the latter term is used in the pertinent statute.

## IV

In seeking a definition of "publication office" one should note at the outset that in order to comply with the requirements of *N. J. S. A.* 35:1–2.2, a newspaper must be entered as second-class matter under the postal laws and regulations of the United States. 39 *U. S. C. A.* § 4352 provides in pertinent part as follows:

(a) Upon application in the form prescribed by him the Postmaster General shall enter as second class mail, at the Post Office where the *office of publication* is maintained, any publication which is entitled under sections 4353–4357 of this title to be classified as second class mail. * * * [Emphasis supplied]

Section 4354 provides that generally a mailable periodical publication is entitled to be entered and mailed as second class mail if it "is issued from a known office of publication."

Section 132.222 of the *U. S. Postal Service Manual* defines "known office of publication":

* * * A *known office of publication is a public office where the business of the publication is transacted during the usual business hours.* The office must be maintained at the place where the publication has been granted original second class mail privileges. *Offices for the trans-*

*action of business may be maintained at more than one place,* but mailings may be accepted at the second class pound rates only at the post office where original or additional mail privileges have been authorized. [Emphasis supplied]

There seems to be a distinct correlation between that portion of *N. J. S. A.* 35:1–2.2 requiring publication in the municipality where the publication office is situate and the one dealing with the entry of the newspaper as second-class mail matter. It was noted earlier herein that the requirement for the entry as second-class mail matter was contained in the original statute, and that the term "publication office" was not employed until 1941, when provision was made for continuous publication "in the municipality where its publication office is situate." *L.* 1941, *c.* 409. Since the federal postal laws, as well as the pertinent regulations, employ the term "office of publication," there is a reasonable inference that the legislative intent at the time of the 1941 amendment was to attribute to the words "publication office" the meaning given to the comparable words "office of publication" in the federal postal laws and regulations.

According to these laws and regulations, there must be a known office of publication, one where the business of the publication is transacted during usual business hours. There is a significant recognition that offices for the transaction of business may be maintained at more than one place, although second-class mailings are accepted only at the post office where original or additional mail privileges have been authorized. Measured by these standards, there is no doubt that the *Review* has an office of publication in Whitehouse Station within the purview of the federal laws and regulations.

The language of *N. J. S. A.* 35:1–2.2 does not warrant a different interpretation or definition of "publication office." Such office, as distinguished from "place of publication," is where activities are conducted which lead to the ultimate publishing of the newspaper. There is nothing in the statute which requires editorial or business functions to

be wholly performed at the publication office, or which limits a newspaper to one "publication office." It is true, of course, that the office ought to be more than a nominal one established solely to meet the requirement of the statute. It should be genuinely engaged in the transaction of the newspaper's business during usual business hours.

 Prior to its acquisition by Recorder, the *Review* was admittedly qualified to print official municipal advertising. The court finds from the evidence a clear intent on the part of the new owner to continue transacting business at Whitehouse Station office. In the *Review's* issue of June 18, 1969 a news item appeared which reported the sale of the newspaper and announced that the *Review* would "open an office shortly in Clinton while maintaining the office in Whitehouse Station." The masthead continued to read "Whitehouse Station," and the statement of ownership, management and circulation filed with the post office identified the location of the "known office of publication" as Whitehouse Station, even though Clinton was named as the headquarters or general business offices. The Whitehouse Station office continued to be staffed, regular business hours were maintained, news and sports items were received there, advertising was solicited and accepted, and circulation was attended to.

One cannot say that the *Review* has not had stability and continuous existence for a period of at least two years in Readington Township, the municipality which includes Whitehouse Station. *Cf. In re Bond Printing Co., Inc., supra.*

The court concludes, therefore, that where, as here, a newspaper concededly eligible to publish official advertising of a municipality, and having a publication office in that municipality, changes ownership and transfers some of the editorial, advertising and business operations elsewhere, but retains and staffs the original office for the transaction of business, and no change is made with respect to the entry of the newspaper as second-class mail matter in the local

post office, the original office does not lose its status as the publication office of the newspaper within the meaning of *N. J. S. A.* 35:1–2.2.

The Whitehouse Station office of the *Review* is, therefor, its "publication office" within the meaning of that statute.

## V

A final issue remains for consideration. It is whether Readington Township, of which Whitehouse Station is a part, is the municipality wherein the *Review* has been published continuously for at least two years. The problem is complicated by the statement in *Montesano v. Liberty Warehouse Co., supra,* that "the place of publication of a newspaper is where the paper is first put into circulation, where it is first issued to be delivered or sent, by mail or otherwise, to its subscribers." See also, *Wildwood, etc., Pub. Co. v. Wildwood, supra,* and *Schultz v. Board of Education, Wanaque, supra.* The substance of this language, though varied in form, is found in numerous cases in other jurisdictions.

From the evidence presented in this case it appears that news items and advertising matter are received and edited mainly at the *Review* offices in Whitehouse Station and Clinton, and the copy is then sent or taken to the printing plant in Stirling (Bernardsville prior to August, 1970) during the week preceding the day of publication. The physical distribution of each issue is made in substantially the following manner: Every Tuesday night, between 8 and 9 p.m., a delivery truck is dispatched from Whitehouse Station to the printing plant, where the copies, bundled or bagged, and labeled according to destination, are loaded onto the truck, which then proceeds along a regular route in a generally counterclockwise direction. Copies of the newspaper are first dropped off at Oldwick, in the northeast corner of Hunterdon County, and mailings and deliveries are then made at post offices and other locations in a number of com-

munities, including, in order, Califon, High Bridge, Glen Gardner, Hampton, Clinton, Annandale, Lebanon, Whitehouse, Whitehouse Station, Flemington and Readington. Mailings at other post offices are by arrangement with the postmaster at Whitehouse Station.

According to circulation figures for the month of January 1970, out of a total issue of about 2500 copies, 582 were distributed at Whitehouse Station, 364 at Flemington, 285 at Clinton, and 276 at High Bridge. Other communities received relatively few copies. During the month of August 1971, 737 copies were distributed in Whitehouse Station and 887 in Clinton. The figures for most of the other places remained virtually unchanged.

The language of *Montesano,* if interpreted and applied literally, might suggest that the *Review* is first published in Oldwick, since that is where the first delivery is made, or, if Whitehouse Station is to qualify as the place of publication, that the entire issue of the *Review* must be brought back to that location for initial distribution by mail or otherwise. The court is of the opinion that such interpretation would be manifestly unrealistic and unreasonable when viewed in the context of the legislative intent.

It has been said that "statutes should be read sensibly so as to be consistent with reason and good discretion," *Schierstead v. Brigantine,* 29 *N. J.* 220, 230 (1959) ; *Keenan v. Board of Chosen Freeholders, Essex County,* 105 *N. J. Super.* 271, 279 (Law Div. 1969), and that "interpretations which lead to absurd or unreasonable results are to be avoided." *State v. Gill,* 47 *N. J.* 441, 444 (1966).

██ *N. J. S. A.* 35:1–2.2 and *N. J. S. A.* 40:53–2, considered together and in conjunction with numerous other statutes requiring the publishing or printing of such official matter as ordinances, resolutions, notices, bids, and the like (an illustrative listing of which is found in *Wildwood, etc., Pub. Co. v. Wildwood, supra,* 35 *N. J. Super.* at 544–545), reveal a legislative scheme for the dissemination of official information to members of the public affected thereby. The

specific concern of *N. J. S. A.* 35:1–2.2 is that only newspapers having stability and continuity of existence in the municipality where the publication office is maintained should be qualified for the publishing of official advertising. *In re Bond Printing Co., Inc. supra. N. J. S. A.* 40:53–2, which provides for the publication of official notices in "at least one newspaper published and circulating in the municipality," if there be such newspaper, is designed to ensure wide and prompt dissemination of official matter to the inhabitants of the community. The two statutes complement each other.

 There is no doubt in the court's mind that the *Review* is an established weekly newspaper that has wide circulation throughout Readington Township. A substantial part of each issue has always been distributed in that municipality or mailed from the Whitehouse Station Post Office. Until ownership of the newspaper was changed, practically all of the operations, including printing, mailing and other distribution, took place in or from Whitehouse Station, so that the problem now before the court did not exist.

· The court does not consider it persuasive or controlling that physical delivery of the *Review* is now first made elsewhere than at Whitehouse Station. It is clear that the delivery procedure in effect since the transfer of ownership is designed solely for convenience and expedition in effecting local distribution, and is not intended to make any community other than Readington Township the place of publication within the meaning of *N. J. S. A.* 35:1–2.2. A like result was reached in *Montesano,* in which the maintenance of a branch office in another municipality to facilitate the local distribution of a newspaper was held not to constitute a publication of the newspaper in that municipality.

Actually, the *Review* is delivered to the distribution and mailing points the night before the day of issue, so that, in a sense, there is a simultaneous issuance of the newspaper at all locations.

In the case of *Hinchman v. Barns,* 21 *Mich.* 556, 559–560 (Sup. Ct. 1870), the court cautioned against inquiring narrowly into the precise spot of first issue of a newspaper, and held that each of the Detroit papers involved was published, so far as practicable, in every part of the same city at the sametime, and it was immaterial that the office of one of the papers was in the second ward of the city and not in the senatorial district in which the particular notice was required by statute to be published. The court said:

Statutes, upon which the public are to act, do not purposely lay traps of this character, and a construction that will have this effect is not to be adopted unless compelled. If it should be adopted, the question of the validity of a notice in some cases might require the courts to inquire, when a fire or other accident in one establishment required the proprietors to resort to the office and employ the agencies of a neighboring establishment to publish an issue, whether the office supplying the accommodation was within the same ward or not, so that the place of publication could be considered the same. We are clearly of opinion that no such inquiries are requisite; that within the meaning of this statute a city, village or township in which a paper is issued is its place of publication, — one part of it just as much as another, and that the statute does not design to take notice of inferior subdivisions, or to inquire at all into the circumstance of whether the proprietors printed their own paper or hired another to do so, or whether they made distribution through their own agents, or by selling their issues, or to regard at all so unimportant a circumstance as whether the office of the publishers is on one side of a street in ward One, or on the other side of the same street in ward Two, when in each case the manner of publication would be the same, the paper would reach the same persons, give the same notice of the matters it contained, and accomplish the same purposes.

On the facts here present it would be unreasonable to hold that the *Review* is not published in Readington Township merely because each issue of the newspaper is not transported back to Whitehouse Station from the printing plant before deliveries are made elsewhere. The term "publish" should not be given so restrictive an application. A sensible construction of *N. J. S. A.* 35:1–2.2 leads to the conclusion that the *Review* is published in Readington Township.

## VI

By reason of the foregoing, the court concludes that the *Review* is qaulified for the publication of official advertising in accordance with the provisions of *N. J. S. A.* 35:1–2.2.

Judgment will be entered accordingly.